Filed 6/25/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SAVE PANOCHE VALLEY et al., | H037599 |
| Plaintiffs and Appellants, | (San Benito County Super. Ct. No. CU-10-00220) |
| v. | |
| SAN BENITO COUNTY, | |
| Defendant and Respondent; | |
| PV2 ENERGY, LLC et al., | |
| Real Parties in Interest and Respondents. | |

Appellants Save Panoche Valley, Santa Clara Valley Audubon Society, and Sierra Club (collectively Save Panoche Valley) appeal from a trial court's order denying their petition for writ of mandate. Save Panoche Valley challenged respondent San Benito County's (hereafter County) certification of an environmental impact report (EIR) regarding a proposed solar power development in the area and the County's cancellations of Williamson Act contracts. Respondents and real parties in interest Solargen Energy, Inc., Solargen Energy DE, PV2 Energy, LLC, PF2 Energy Holdings, LLC, and Nevo Energy, Inc. (collectively Solargen), are the developers of the proposed solar project.

For reasons set forth below, we find no error with the County's certification of the EIR or its cancellation of the Williamson Act contracts. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Panoche Valley and the Proposed Project Site*

The proposed site of the Panoche Valley Solar Farm (PVSF) Project[1] is located approximately 0.75 miles north of Panoche Road and Little Panoche Road in San Benito County. The site is approximately two miles southwest of the Fresno County line and the Panoche Hills, and 15 miles west of Interstate 5 and the San Joaquin Valley. The land where the project would be set is primarily used for cattle grazing, and encompasses 4,885 acres. The draft environmental impact report (DEIR) noted that according to the County Farm Service Agency, the land in the project site is able to support approximately one head of cattle per 25 acres. The area surrounding the project site is also mostly used for cattle grazing, though some farms use the land for agricultural purposes. Most of the farms close to the proposed project site rely on rotational grazing and dry farming. Agricultural operations nearby include Heirloom Organics, a farm that produces organic field crops on approximately 50 acres, and the Claravale Farm, a raw milk dairy and pistachio orchard. Both Heirloom Organics and Claravale Farm are more than 1,000 feet from the initially proposed project boundary.

Cattle grazing has been the primary use of the proposed project site for the past 100 years. Previously, the area supported more agricultural field crops than it does in the present day. In the 1960s and the 1970s, farmers planted irrigated crops such as watermelons, potatoes, turnips, and cotton in the area. However, as the project's DEIR noted, in recent years, landowners stated there was a significant increase in economic barriers to growing irrigated crops in Panoche Valley. Specifically, landowners faced issues with regards to water supply and quality in the area. The DEIR concluded that

---

[1] Further references to PVSF, the solar project, the proposed project site, or the project site are to the Panoche Valley Solar Farm.

2

after some groundwater pumping tests, water levels may be adequate for "some" crop production, but noted that local groundwater quality would restrict production.

The proposed project site and surrounding area have been identified as an important area for conservation of certain animal and plant species, including the San Joaquin kit fox, giant kangaroo rat, and blunt-nosed leopard lizard.  The National Audubon Society has identified the Panoche Valley as a globally significant "important bird area."  The Panoche Valley is known for high concentrations of wintering raptors, large sparrow flocks, burrowing owls, and other birds.  At the time the final environmental impact report (FEIR) was drafted, the San Joaquin kit fox, giant kangaroo rat, and blunt-nosed leopard lizard were considered endangered and at a significant risk of extinction.  The blunt-nosed leopard lizard is listed as endangered in both the federal and state level.

### The Solar Project (PVSF)

Solargen submitted an application to the County for a conditional use permit to construct a 420 megawatt photovoltaic solar power plant on the proposed site on October 16, 2009.  A DEIR was prepared, contemplating the environmental impacts of the proposed construction.  The initial project proposal called for the construction of approximately three to four million solar arrays, a substation including an operation and maintenance building and transmission interconnection towers, onsite access roads, and a buried electrical collection conduit.  The proposed solar project would transmit the generated electricity through the state's existing electrical grid through two PG&E transmission lines.  The solar project would operate for at least 30 years, with the possibility that the project would be repowered.  Regardless of the eventual lifespan of the project, under the initial proposal, Solargen would remain responsible for removing, recycling, and disposing of all the solar rays, inverters, transformers, and any other structures on the project site after its completion.

*Administrative Proceedings and the CEQA Process*[2]

Solargen's proposed project in the Panoche Valley is set to be undertaken on acres of land designated as "Agricultural Rangeland," including some parcels that were under the Williamson Act contracts. In order to proceed with the development, Solargen requested that the County make a finding that the project was compatible with the Williamson Act, a request that was denied by the County's Agricultural Preserve Advisory Committee (APAC) on November 5, 2009. This denial was later affirmed by the San Benito County Board of Supervisors (Board).[3] Solargen then requested a cancellation of the Williamson Act contracts, which totaled approximately 6,953 acres of land, of which 4,563 were within the proposed project's boundaries.

The County circulated the DEIR for an agency and public review and comment period on June 28, 2010. The DEIR concluded that the proposed project would have significant and unmitigable visual impacts to the landscape of Panoche Valley because of the presence of solar panels and other structures that would thereafter dominate the majority of the landscape. The DEIR also provided an overview of the potential biological impacts with respect to the populations of blunt-nosed leopard lizards, giant kangaroo rats, and San Joaquin kit foxes, explaining that Solargen and the County agreed to meet with stakeholders, agency representatives, and experts on each of the affected species, to identify appropriate mitigation lands that would reduce impact and sufficiently conserve habitats.

---

[2] CEQA stands for the California Environmental Quality Act. CEQA is codified in Public Resources Code section 21000 et seq. The CEQA Guidelines, which implement provisions of CEQA, are codified at California Code of Regulations, title 14, section 15000 et seq. Further references to the CEQA Guidelines are to the California Code of Regulations, title 14, section 15000 et seq.

[3] The San Benito County Board of Supervisors is not a party to this action.

4

The DEIR also analyzed several alternatives. Alternative A would avoid the highest density of giant kangaroo rats, and would be located on a reduced area of 3,927 acres. The Westlands CREZ was also suggested as an alternative site. Located in Kings and Fresno Counties, the Westlands CREZ is located on fallow agricultural lands leased by the Westlands Water District from Westside Holdings for the specific purpose of developing a 5,000 megawatt solar power plant on approximately 30,000 acres.

The County's APAC considered Solargen's Williamson Act cancellation requests on September 2, 2010, and ultimately recommended a denial of the request. APAC stated that it believed public concerns did not substantially outweigh the objectives of the Williamson Act, and that "while the State's or applicant's interest in renewable energy or the county's interest in short term jobs are vital and legitimate, the project's costs are not worth the limited gains to the County." Furthermore, APAC reasoned that it believed "[t]here is proximate noncontracted land which is both available and suitable for the proposed use on the contracted land," in reference to the Westlands CREZ.

During the public comment period, the California Department of Fish and Game (DFG) issued a comment letter in July 2010, where it analyzed and offered recommendations on avoiding an unlawful "take" of certain special species of concern, including the blunt-nosed leopard lizard, on the proposed project site in the Panoche Valley.[4] DFG asserted that the original proposal to fence in locations where blunt-nosed leopard lizards were found would actually result in a "take" in the form of a capture. DFG offered several recommendations to ensure the project would not result in a "take," and to safeguard the persistence and recovery of the blunt-nosed leopard lizard population in the Panoche Valley. DFG recommended completing a survey of the

---

[4] "The general definition of 'take' in the Fish and Game Code is 'hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture, or kill.' " (*Watershed Enforcers v. Department of Water Resources* (2010) 185 Cal.App.4th 969, 974, fn. 3.)

proposed site for the blunt-nosed leopard lizard according to DFG's blunt-nosed leopard lizard survey protocol prior to completing CEQA review, and submitting proper permit applications pursuant to the California Endangered Species Act (CESA).[5] DFG also recommended implementing a minimum 395-acre avoidance buffer, and avoiding all washes in the project site.

The FEIR was released on September 30, 2010. One proposed alternative, titled Alternative A Revised, incorporated changes meant to avoid areas with the highest concentration of giant kangaroo rat and blunt-nosed leopard lizard populations. The proposal included a biological conservation easement on 1,683 acres of the project site. Panel heights would be reduced from 25 feet in the original proposal to 12.5 feet. The project would be located on approximately 3,202 acres of land, for a total of 53 1-megawatt power blocks and 172 2-megawatt power blocks, which would generate 399 megawatts of power. The FEIR stated that the alternative would "meet most project objectives," and would "eliminate five of the significant and unmitigable impacts on biological and visual resources that would result from construction" of the solar project. Notably, the project proposed in Alternative A is 34 percent smaller than the initial project proposal, with a "reduced footprint . . . , impacts to noise, agriculture, cultural resources, biological resources, and water resources . . . ."

The FEIR outlined several mitigation measures to avoid impact with biological species such as the blunt-nosed leopard lizard, including completion of a preconstruction survey of the project site in accordance with DFG protocols and implementing a 22-acre buffer zone for each individual blunt-nosed leopard lizard. The FEIR explained that the 22-acre buffer zone was calculated as being the largest home range size of a blunt-nosed leopard lizard as compiled by a biological study. The FEIR further provided a mitigation

---

[5] The provisions of CESA are located at Fish and Game Code section 2050 et seq.

6

measure that if a blunt-nosed leopard lizard is found in the construction site, all construction will cease and the United States Fish and Wildlife Service (USFWS) and the DFG will be contacted. Furthermore, in the event that a blunt-nosed leopard lizard is killed or harmed during the course of construction, all construction will cease and the USFWS and the DFG will be contacted. Work will not restart on the site until both the DFG and the USFWS respond and all recommended mitigation measures are taken.

On October 12, 2010, the Board conducted a public hearing on the FEIR, and subsequently adopted a resolution certifying the FEIR, adopting CEQA findings including a statement of overriding interests, and approving the Williamson Act cancellation requests. The County's planning commission approved the conditional use permit on October 20, 2010. The planning commission then recommended that the Board approve Solargen's development agreement. On November 1, 2010, several groups including Save Panoche Valley, Center for Biological Diversity, and other interested parties appealed the planning commission's decision to the County's Board of Supervisors. The Board nevertheless adopted a resolution denying the appeal and upholding the planning commission's decisions, approved the development agreement, and made findings pursuant to CEQA.

### *The Trial Court Litigation*

On November 17, 2010, Save Panoche Valley filed a petition for a writ of mandate in the trial court, challenging the County's decision to certify the FEIR and its decision to grant Solargen's Williamson Act cancellation requests. After a hearing, the trial court denied Save Panoche Valley's petition on August 30, 2011. The trial court, in its order, noted that it found that the administrative record reflected the existence of substantial evidence to support the Board's finding that "other public concerns" substantially outweighed the objectives of the Williamson Act. The trial court also found that the FEIR was sufficiently thorough, and that the Board did not err when it approved the solar

7

project.  Judgment denying the petition for writ of mandate was entered on September 29, 2011.

Save Panoche Valley filed a timely notice of appeal on November 14, 2011.

<strong>STANDARD OF REVIEW</strong>

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (Pub. Resources Code, § 21168.5.)  Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' "  (*Vineyard Area Citizens for Responsible Growth*, *Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426, fn. omitted (*Vineyard Area Citizens for Responsible Growth*).)

There are two types of error which may constitute an abuse of discretion under CEQA.  First, an agency may fail to proceed in the manner laid out under the CEQA regulations.  Second, an agency may reach factual determinations under CEQA that are not supported by substantial evidence in the record.  (Pub. Resources Code, § 21168.5.) The standards of appellate review for these two types of errors differ greatly.  We examine any alleged procedural defects under a de novo standard of review.  (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553 (*Citizens of Goleta Valley*).) However, in determining whether or not the agency's findings are supported by the requisite substantial evidence standard, we apply a substantial evidence standard of review.  (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 986-987 (*California Native Plant Society*).)  "We apply the substantial evidence test to conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve

8

factual questions." (*City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 898.)

For CEQA, "substantial evidence" is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made . . . is to be determined by examining the whole record before the lead agency. Argument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate . . . does not constitute substantial evidence." (CEQA Guidelines, § 15384, subd. (a).) The agency is the finder of fact and a court must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.) " 'Technical perfection is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure.' " (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 836.)

Additionally, "[a] court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393 (*Laurel Heights*).) "[T]he relevant inquiry here is not whether the record establishes compliance but whether the record contains evidence [the agency] *failed* to comply with the requirements of its . . . regulatory program. In the absence of contrary evidence, we presume regular performance of official duty. (Evid. Code, § 664.)" (*City of Sacramento v. State Water Resources Control Bd.* (1992) 2

9

Cal.App.4th 960, 976.) The project opponents bear the burden to show the EIR is legally inadequate. (*Al Larson Boat Shop*, *Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 740; Pub. Resources Code, § 21168.5; CEQA Guidelines, § 15151.)

With this framework in mind, we turn to the merits of Save Panoche Valley's claims.

## DISCUSSION

On appeal, Save Panoche Valley raises two main arguments. First, Save Panoche Valley contends that the County violated the Williamson Act by cancelling the contracts when there was insufficient evidence to support its finding that other public concerns substantially outweighed the objectives of the Williamson Act, and when there was a proximately located alternative site for the project at the Westlands CREZ. Second, Save Panoche Valley argues that the County violated CEQA when it certified the FEIR and approved the project, as there were deficiencies in the impact analyses, and because the County incorrectly approved the project despite the existence of a feasible alternative.

For the reasons set forth below, we disagree with Save Panoche Valley's contentions, and find no error with the Board's approval of the FEIR and its cancellation of the Williamson Act contracts. We will address each of Save Panoche Valley's arguments in turn.

### I. Cancellation of the Williamson Act Contracts

Save Panoche Valley contends that the Board erred in cancelling the Williamson Act contracts for parcels of land located within the proposed project boundary. Primarily, Save Panoche Valley makes two arguments: (1) that the record fails to support the County's finding that other public concerns substantially outweigh the objectives of the Williamson Act, and (2) there is proximate, noncontracted land that is both available and suitable for a large-scale solar facility, rendering the cancellation in error.

10

*Overview of the Williamson Act*

"The Williamson Act establishes a mechanism for saving agricultural land by allowing counties to create agricultural preserves and then to enter into contracts with landowners within those preserves. (Gov. Code, § 51200 et seq.) A Williamson Act contract obligates the landowner to maintain the land as agricultural for 10 or more years, with resulting tax benefits. (*Id.*, §§ 51240-51244.) Absent contrary action, each year the contract renews for an additional year, so that the use restrictions are always in place for the next nine to 10 years. (*Id.*, § 51244.)" (*Friends of East Willits Valley v. County of Mendocino* (2002) 101 Cal.App.4th 191, 195.)

There are several methods to terminate a Williamson Act contract, including nonrenewal and cancellation. Either the landowner or the city or county may decline to renew a contract. (Gov. Code, § 51245.) The party seeking nonrenewal of the contract must serve a notice to the other party, which the other party may then oppose. (*Ibid.*) Otherwise, automatic renewal of the contract will expire at the end of the term. (*Id.* §§ 51245, 51246.)

A second way to terminate a Williamson Act contract is to cancel the contract, which is the route the County took in this particular instance. The procedures for cancelling a Williamson Act contract, outlined in Government Code section 51282, require that a board or council may only approve a cancellation if it makes certain findings. The requisite findings include either that the cancellation is consistent with the purpose of the Williamson Act (Gov. Code, § 51282, subd. (a)(1)), or that the cancellation is in the public interest (*id*. subd. (a)(2)). "For purposes of paragraph (2) of subdivision (a) cancellation of a contract shall be in the public interest only if the council or board makes the following findings: (1) that other public concerns substantially outweigh the objectives of this chapter; and (2) that there is no proximate noncontracted land which is both available and suitable for the use to which it is proposed the contracted

11

land be put, or that development of the contracted land would provide more contiguous patterns of urban development than development of proximate noncontracted land." (*Id*. subd. (c).) "As used in this subdivision 'proximate, noncontracted land' means land not restricted by contract pursuant to this chapter, which is sufficiently close to land which is so restricted that it can serve as a practical alternative for the use which is proposed for the restricted land. [¶] As used in this subdivision 'suitable' for the proposed use means that the salient features of the proposed use can be served by land not restricted by contract pursuant to this chapter. Such nonrestricted land may be a single parcel or may be a combination of contiguous or discontiguous parcels." (*Ibid*.)

### *The County's Findings of Other Public Concerns*

In its cancellation of the Williamson Act contracts in the Panoche Valley, the Board found that other public concerns substantially outweighed the objectives of the Williamson Act. Save Panoche Valley argues that the proposed solar project is not compatible with the goals of the Williamson Act, and that it cannot be said that sufficient evidence supported the conclusion that the public interest in having a solar farm substantially outweighed the purpose of the Williamson Act. We agree in part, but disagree with Save Panoche Valley's conclusions.

Here, our review is not focused on whether or not the County's cancellation was compatible with the goals of the Williamson Act. That is but one way to cancel a Williamson Act contract. As the County unequivocally canceled the contract on the basis that other public interests substantially outweighed the purpose of the Williamson Act, our evaluation is based upon whether or not there is substantial evidence to support this conclusion. Therefore, though we may agree with Save Panoche Valley's contention that the solar project is not compatible with the goals of the Williamson Act, that determination is not dispositive of the issues raised on appeal. Furthermore, upon our review of the records before us, we find that there is substantial evidence to support the

12

County's determination that the public's interest in renewable energy outweighed the purpose of the Williamson Act.

California's interest in renewable energies is well-established. In 2006, the Legislature enacted the California Global Warming Solutions Act of 2006, meant to reduce the statewide amount of greenhouse gas emissions in California. (Health & Saf. Code, § 38500 et seq.; Stats. 2006, ch. 488 (AB 32).) The Legislature made a finding that the Williamson Act was meant to counteract some of the harmful impacts caused by global warming, which included threats to the economy, public health, natural resources, and overall environment. (Health & Saf. Code, § 38501, subd. (a).) To further the goal of reduced emissions, the Legislature passed the Renewables Portfolio Standard (RPS), which in part required energy companies to reach a goal that 33 percent of their total retail energy sales be from renewable energy sources by the end of 2013. (Pub. Util. Code, § 399.15, subd. (b)(2)(B).)

There is substantial evidence in the administrative record that the solar project proposed by Solargen would help further the state's progress toward achieving its goal for increased renewable energy and reduced greenhouse emissions, as the proposed project would generate renewable energy for the state while providing jobs to local residents. The reason for the proposed project's existence is to create a solar farm to generate renewable energy. Though completion of the solar project *by itself* will not fulfill the state's renewable energy goals, each additional renewable energy project helps the state advance toward meeting the requirements of the RPS.

Additionally, agriculture would continue in limited amounts on the land despite the cancellations. As described in the findings made by the Board in its resolution on the Williamson Act cancellations, some lands on and adjacent to the project site would continue to be encumbered by conservation easements that would require cattle grazing. The cancellation would also only represent 1.2 percent of all contracted land within San

13

Benito County, and 0.04 percent of all contracted land in the State of California itself. Solargen also accepted full responsibility for removing the panels after the termination of the project, and is tasked with restoration and ensuring that the lands return to its original use after the end date of the solar project.

Save Panoche Valley is correct in that there is also evidence in the record supporting the denial of the Williamson Act cancellation requests. For example, there is evidence that the land is used for cattle grazing, and that the soil in the valley is rated as agricultural land. These factors all indicate that preservation of the Panoche Valley in its agricultural state does further the purpose of the Williamson Act, which is to conserve the state's agricultural resources. However, we are not tasked with weighing the pros and cons of cancelling the Williamson Act contracts, that duty is reserved for the Board. Our review ends when we find substantial evidence, as exists in the record here, to support the Board's conclusion that other public concerns substantially outweigh the purposes of the Williamson Act. In that regard, we do not find that the board erred in its determination that such other public concerns exist.

### *Proximate*, *Noncontracted Alternatives Were Not Available*

Save Panoche Valley further objects to the Board's determination that there was no proximate, noncontracted land that was a suitable alternative for the proposed project. In support, Save Panoche Valley argues that the Westlands CREZ site is a proximate, suitable alternative that is not under Williamson Act contracts. However, we find that the Board's determination that there was no suitable, proximate, noncontracted land to be supported by substantial evidence.

As our Supreme Court has determined, the word "proximate" in the context of the Williamson Act does not necessarily mean that the lands must be bordering each other. (*Sierra Club v. City of Hayward* (1981) 28 Cal.3d 840, 861.) In *Sierra Club*, the Supreme Court reasoned that " 'proximate' " should be construed in the same manner as

14

" 'adjacent,' " in so much that locations "up to seven and one-half miles part" may be considered " 'adjacent' " or " 'proximate.' " (*Ibid.*) As the *Sierra Club* court posited, "[t]he purposes of the Williamson Act require that 'proximate' not be construed to unreasonably limit the search for suitable noncontracted land. It would serve no purpose of the act to reject unrestricted property perfectly suited to fill the needs addressed by the proposal simply because that property is not in the immediate vicinity of the restricted land. In fact, under some circumstances land several miles from the proposed development site may be near enough to serve the same purposes." (*Ibid.*) The court therefore concluded that " 'proximate' property means property close enough to the restricted parcel to serve as a practical alternative for the proposed use." (*Ibid.*)

Under the definition of what constitutes "proximate" land provided in *Sierra Club*, we find there was substantial evidence in the record to support the Board's conclusion that no such proximate alternative existed. The Westlands CREZ was not simply located several miles away from the project site. In fact, the Westlands CREZ was not only located approximately 60 miles away, but was located in two different counties, Fresno and Kings Counties. Substantial evidence also existed in the record that the Westlands CREZ was encumbered by several Williamson Act contracts, and that portions of the land there were under contract by Westside Holdings and the Westlands Water District. Notably, Solargen previously approached Westside Holdings in an attempt to come to an agreement to use the Westlands CREZ as a potential site, but failed to come to an arrangement.[6]

---

[6] Solargen testified before the APAC on September 2, 2010, stating that it attempted to negotiate with representatives from the Westlands Water District but failed to come to an agreement. However, as Save Panoche Valley notes in its reply brief, Solargen later testified before the Board on October 12, 2010, that it contacted the Westlands CREZ about purchasing property, and was quoted a price of between $15,000 to $25,000 an acre. Save Panoche Valley argues that these two testimonies are a (continued)

15

Given that we find substantial evidence supported the Board's conclusions that other public interests outweighed the purpose of the Williamson Act, and because we find that substantial evidence also supported the Board's determination that there was no proximate, noncontracted alternative site available, we find the trial court did not err in its denial of Save Panoche Valley's petition for writ of mandate challenging the Williamson Act cancellations.

## II. CEQA Violations

Save Panoche Valley argues that the county violated CEQA in three ways: (1) the County approved the project despite the fact that there was a feasible, environmentally-superior alternative, (2) the EIR's impact analyses were deficient, and (3) the findings made by the Board were improper and unsupported by evidence. We address each of these principle contentions in turn.

### Overview of CEQA and the Applicable Provisions

The Legislature enacted CEQA in order to "[e]nsure that the long-term protection of the environment" would guide public decisions. (Pub. Resources Code, § 21001, subd. (d).) "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights*, *supra*, 47 Cal.3d 376, 390.)

"Pursuant to CEQA's 'substantive mandate,' an agency may not approve a proposed project if feasible alternatives exist that would substantially lessen its significant environmental effects." (*California Native Plant Society*, *supra*, 177 Cal.App.4th 957, 996; Pub. Resources Code, § 21002.) Whether or not a project is feasible, under the CEQA Guidelines, is defined as whether or not a project is "capable of

---

contradiction. We do not agree with this assessment, as failing to come to an agreeable purchase price is analogous to failing to come to an agreement.

being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors."[7] (CEQA Guidelines, § 15364.) A finding of infeasibility must be supported by sufficient evidence in the record. (Pub. Resources Code, § 21081.5 ["In making the findings required by [section 21081, subdivision (a)(3)], the public agency shall base its findings on substantial evidence in the record."]; CEQA Guidelines, § 15091, subd. (b) ["The findings required by [CEQA Guidelines § 15091, subd. (a)] shall be supported by substantial evidence in the record."].)

Under Public Resources Code section 21081, an agency also may not approve a project in which an EIR identifies significant impacts on the environment if a project is carried out, unless the agency makes specific findings with respect to each significant effect. "Citing [Public Resources Code] section 21081, subdivision (a) (hereafter section 21081(a)) and CEQA Guidelines section 15091[, subdivision] (a), one leading commentator has explained that '[f]or each significant effect identified in the EIR, the approving agency must make one or more of the following findings: (1) that changes or alterations have been required in, or incorporated into, the project that avoid or substantially lessen the effect; (2) that the agency making the findings lacks jurisdiction to make the change, but that another agency does have such authority, and either has made, or can and should make, the change; and/or (3) *that specific economic*, *legal*, social, technological, or other *considerations*, including considerations for the provision of employment opportunities for highly trained workers, *make infeasible the mitigation measures or project alternatives identified in the final* EIR.' (Remy et al., Guide to Cal.

---

[7] "The CEQA Guidelines, promulgated by the state's Resources Agency, are authorized by Public Resources Code section 21083. In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous." (*Vineyard Area Citizens for Responsible Growth*, *supra*, 40 Cal.4th 412, 428, fn. 5.)

Environmental Quality Act, *supra*, at p. 323, italics added.)" (*County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 100.)

### The Westlands CREZ as a Feasible Alternative

Save Panoche Valley argues that the Westlands CREZ is a feasible, proximate alternative that the Board erroneously dismissed as infeasible.[8] We find this argument to be without merit.

As courts have noted, "[a] major function of an EIR 'is to ensure that all reasonable alternatives to proposed projects are thoroughly assessed by the responsible official.' " (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 735; see Pub. Resources Code, § 21002.1, subd. (a).) The CEQA guidelines mandate that the EIR should include a range of "reasonable alternatives to the project" that will "feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project, and evaluate the comparative merits of the alternatives." (CEQA Guidelines, § 15126.6, subd. (a).) Not all alternatives need to be analyzed, but the EIR should "consider a reasonable range of potentially feasible alternatives that will foster informed decisionmaking and public participation." (*Ibid.*) Infeasible alternatives need not be considered. (*Ibid.*) Alternatives should not be excluded simply because it would hinder " 'to some degree the attainment of the project objectives' " or that it " 'would be more costly.' " (*Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1354.)

As we previously noted, an agency may not approve a project unless it finds the alternatives are infeasible, a finding that must be supported by substantial evidence in the

_____

[8] As discussed *ante*, Save Panoche Valley similarly argued that the Westlands CREZ was improperly deemed infeasible in the context of cancellations of Williamson Act contracts. While the analysis is similar, whether or not a project is "feasible" in the context of a CEQA violation is different, so we will address the feasibility of the Westlands CREZ as an alternative separately.

record. (*California Native Plant Society*, *supra*, 177 Cal.App.4th at p. 996; Pub. Resources Code, § 21081.5.) Save Panoche Valley contends that none of the reasons cited by the Board for the infeasibility of the Westlands CREZ alternative are supported by substantial evidence in the administrative record, and that according to the FEIR, the Westlands CREZ alternative was in fact an environmentally superior alternative to the proposed project site.

The Board cited several reasons for the infeasibility of the project on the Westlands CREZ. First, the Board cited to the fact that there was evidence that the Westlands CREZ alternative could not be completed in a reasonable period of time. Second, the Board cited evidence that jurisdictionally, since the Westlands CREZ was not located in San Benito County, but Kings and Fresno Counties, there was no way to determine with confidence whether or not those counties would even consider approving such a project. Third, the Board found evidence that building the solar project on the Westlands CREZ alternative would not further any public policy goals, as it would deprive the County of potential jobs and other economic benefits stemming from the existence of the project. Fourth, the Board cited evidence that construction on the Westlands CREZ would be potentially legally infeasible because the Westlands Water District may have entered into an agreement with Westside Holdings, which controls the entire acreage of the Westlands CREZ. Lastly, the Board cited evidence that development at the Westlands CREZ would not comport with the timing objectives of the solar project, as it would take a significantly longer time to proceed with the project at the Westlands CREZ location, as Solargen would have to locate and take part in due diligence, would have to negotiate for the land, would have to properly design a project tailored to the site, and would have to undertake another EIR.

Contrary to Save Panoche Valley's claims, we find that the Board's determination that the Westlands CREZ site would be infeasible was supported by substantial evidence

19

in the record. An alternative may be deemed infeasible if it is unable to be completed in a reasonable amount of time, a conclusion that the Board made when it found that since the Westlands CREZ lands lay in two different counties, Kings and Fresno, and when it found that the majority of the Westlands CREZ was held by a private investment group, Westside Holdings.

"[T]he law does not require in-depth review of alternatives which cannot be realistically considered and successfully accomplished; [an agency] could properly find that a property located outside of its decision making authority was not a feasible project alternative." (*Citizens of Goleta Valley*, *supra*, 52 Cal.3d 553, 575.) We note that simply because a proposed alternative lies outside the boundaries of an agency or County's jurisdiction does not automatically render the alternative infeasible. (*Id.* at p. 575, fn. 7.) However, whether or not an alternative site is located within the boundaries of a County is certainly a factor that may be considered when determining a project's feasibility. The fact that there was not only evidence that the Westlands CREZ was not within the boundaries of the County's jurisdiction, but that there was a private party that possessed most of the lands, is ample evidence supporting the infeasibility of the project.

Save Panoche Valley argues that there was a lack of evidence supporting the project's infeasibility at the Westlands CREZ. In part, Save Panoche Valley relies on *Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437 (*Save Round Valley Alliance*), and *Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866 (*Center for Biological Diversity*). In *Save Round Valley Alliance*, the appellate court found that the EIR's analysis of an alternative was insufficient. (*Save Round Valley Alliance*, *supra*, at p. 1465.) However, we fail to find *Save Round Valley Alliance* analogous to the present case. The court in *Save Round Valley Alliance* was concerned with the EIR's lack of analysis with regards to one of the alternatives, as the EIR inappropriately dismissed the alternative as infeasible without engaging in any

20

further analysis into the project's viability at the alternative site. (*Id.* at pp. 1456-1465.) Here, the County did not dismiss the Westlands CREZ project as infeasible without any further analysis. The FEIR and the statement of overriding considerations properly included details and analysis into the viability of the Westlands CREZ project. Similarly, in *Center for Biological Diversity*, the appellate court found the EIR in that case deficient as it failed to allow informed decisionmaking regarding the possibility of an enclosed composting facility as an alternative. (*Center for Biological Diversity*, *supra*, at p. 884.) Here, we are not concerned with whether or not the Board inappropriately failed to provide an EIR with adequate information analyzing an alternative, and therefore these cases are not directly analogous.

As the Board noted in its resolution approving the EIR and its statement of overriding considerations, each reason it stated for the project's infeasibility was independent of one another, and each was sufficient reason for denial of the alternative. Since we find that there was substantial evidence to support the Board's determination that the Westlands CREZ alternative was infeasible due to its lack of proximity and due to its location in Kings and Fresno Counties, and because the land itself was privately owned by Westside Holdings and the Westlands Water District, we need not reach the issue of whether or not substantial evidence supported the Board's other findings of infeasibility.

### The EIR's Biological Impact Analyses

Second, Save Panoche Valley contends that the EIR's impact analyses were deficient in several respects.

1. *Addressing Impacts to the Blunt-Nosed Leopard Lizard.* With respect to the EIR's biological resources analysis, Save Panoche Valley contends that the presence of the blunt-nosed leopard lizard is well-known, but that the EIR failed to adequately complete biological surveys regarding the species. Save Panoche Valley further argues

21

that the DFG concluded that the project would result in an unlawful take of the species under Fish and Game Code section 5050.

As outlined *ante*, the DFG's comment letter regarding the potential impacts the project may have on the blunt-nosed leopard lizard did express the opinion that fencing in the blunt-nosed leopard lizard may constitute a "take." However, our review of the letter in question indicates that DFG's concern was not unequivocal, and that its recommendations of an increased buffer zone and completion of a protocol survey were meant to mitigate and address the potential harmful impacts on the species.

Under CEQA, an agency is not required to conduct all possible tests or exhaust all research methodologies to evaluate impacts. Simply because an additional test may be helpful does not mean an agency must complete the test to comply with the requirements of CEQA. (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1396.) An agency may exercise its discretion and decline to undertake additional tests. (*Ibid.*) Here, the FEIR appears to have addressed the concerns raised by the DFG in its letter, as the FEIR calls for a protocol survey to occur before the commencement of construction on the project site, and further requires a 22-acre buffer zone for each individual blunt-nosed leopard lizard found by the surveyors, a zone determined as the largest home range of a blunt-nosed leopard lizard by a biological study. Accordingly, there is substantial evidence that the negative impacts will be sufficiently reduced via the adopted mitigation measures.

2. *Deferral of Certain Mitigation Measures.* Save Panoche Valley finds fault with certain mitigation measures meant to reduce impact to some of the biological species in the Panoche Valley, including the blunt-nosed leopard lizard, and claims that the County erred in improperly deferring surveys and significant aspects of mitigation until after project approval. Generally, "[f]ormulation of mitigation measures should not be deferred until some future time. However, measures may specify performance

22

standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way." (CEQA Guidelines, § 15126.4, subd. (a)(1)(B).)

Despite the general bar against deferred measures, courts have found that "[d]eferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan. [Citation.] On the other hand, an agency goes too far when it simply requires a project applicant to obtain a biological report and then comply with any recommendations that may be made in the report." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275.) "Essentially, the rule prohibiting deferred mitigation prohibits loose or open-ended or performance criteria. Deferred mitigation measures must ensure that the applicant will be required to find some way to reduce impacts to less than significant levels. If the measures are loose or open-ended, such that they afford the applicant a means of avoiding mitigation during project implementation, it would be unreasonable to conclude that implementing the measures *will* reduce impacts to less than significant levels." (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 945 (*Rialto Citizens for Responsible Growth*).)

Here, the mitigation measures adopted by the County were not loose or open-ended. The mitigation measure meant to address the impact on the blunt-nosed leopard lizard specifically required that upon completion of the survey, a set buffer zone, no less than 22 acres, would be set aside for each blunt-nosed leopard lizard. Other mitigation measures are set forth with similar particularity.

For example, BR-6.1, identified by Save Panoche Valley in its reply brief as deficient, provides that Solargen will conduct preconstruction surveys for nesting and breeding birds. BR-6.1 further provides that after a qualified biologist surveys the area, if active breeding nests are found, a 300-foot buffer will be established around the nest.

23

Furthermore, if golden eagles are found, a 0.5-mile no-activity buffer will be implemented, and if condors are found roosting within 0.5 miles of the area, no construction activity will occur between one hour before sunset to one hour after sunrise until all condors leave the area. The mitigation measure further provided for active monitoring, and measures for potentially relocating nests.

Another measure, BR-7a.2, provides that a qualified biologist to conduct preconstruction surveys for the San Joaquin coachwhip and coast horned lizard, and to relocate any found specimens. BR-7c.1 similarly calls for relocation measures to be undertaken for the short-nosed kangaroo rat, San Joaquin pocket mouse, and Tulare grasshopper mouse.

In sum, though the mitigation measures pointed out by Save Panoche Valley in its reply brief do require that a qualified biologist conduct preconstruction surveys, these measures do not improperly defer significant aspects of mitigation. The measures provide for specific actions to be taken upon discovery of a certain species, such as including a set buffer zone. The measures do not call for a mitigation that is simply adopting the recommendations of the survey providers, which would be an improper deferred mitigation. (See *Rialto Citizens for Responsible Growth*, *supra*, 208 Cal.App.4th 899, 944-945.) The surveys were simply meant to facilitate the completion of these mitigation goals, and we do not find that these measures were designed to allow Solargen to avoid having to mitigate impacts. The mitigation measures did not simply proscribe for Solargen to comply with whatever recommendations are made by surveyors after completion of a protocol survey. (See, e.g., *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 669-672 [holding that deferral of significant aspects of mitigation a violation of CEQA].)

24

In most respects, these preconstruction surveys and mitigation measures were contemplated with the express goal of maintaining certain milestones. We therefore find that the County did not improperly defer mitigation measures.

3. *Mitigation Measures Addressing Other Species of Special Concern.* Save Panoche Valley similarly finds deficiencies with the FEIR's analysis and the County's mitigation measures for several other federal and state endangered species, including the giant kangaroo rat and the San Joaquin kit fox. Save Panoche Valley's contention is that the adopted mitigation measures would not prevent or alleviate the population and habitat loss resulting from the project construction, and that there is nothing in the record to support the ability of several mitigation sites, including Silver Creek, to either enhance habitats or increase species populations. Save Panoche Valley further argues that some of the mitigation sites are not suitable habitats, citing to a DFG letter outlining the agency's belief that "the cumulative loss and degradation of habitat diminishes the mitigation value of adjacent properties and therefore the mitigation as proposed fails to meet the full mitigation standards for impacts to listed species."

However, we find that Save Panoche Valley fails to meet its burden in its challenge to the FEIR in this respect. In order to succeed on its arguments, Save Panoche Valley needed to specify what evidence the Board relied upon in its determination that the mitigation measures would sufficiently preserve and mitigate impacts to the species of special concern, and to show that this evidence could not support the Board's findings. (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626.) Save Panoche Valley cannot simply rely upon conclusions made by the DFG that are contrary to the Board's conclusions. Doing so does not fulfill Save Panoche Valley's burden to demonstrate that substantial evidence does not support the board's findings. (*Ibid.*)

25

In contrast, we find that substantial evidence does support the Board's findings that the mitigation measures would significantly reduce the biological impacts. With respect to the proposed mitigation lands, the FEIR noted that Silver Creek Ranch was specifically identified as an area of high habitat value for many of the special status species. Furthermore, surveys of the Silver Creek Ranch provided the County evidence that there were giant kangaroo rats, San Joaquin kit foxes, and blunt-nosed leopard lizards residing on the area. A study previously determined that roughly 95 percent of the known population of giant kangaroo rats reside on the Silver Creek Ranch. Scat-sniffing dogs similarly found evidence of the San Joaquin kit fox on the mitigation lands. Though the DFG may have expressed concerns that the mitigation lands were not sufficient, this evidence does not rebut the existence of substantial evidence supporting the adequacy of the proposed mitigation lands, such as the Silver Creek Ranch, as an appropriate area for conservation efforts.

Substantial evidence also supported the determination that the County's adopted mitigation measures specific to certain species of special concern would reduce impact to the species. Applicant Proposed Measure (APM) No. BIO-15 called for providing a 389-acre habitat corridor for the giant kangaroo rat. APM No. BIO-16 called for mitigation for the giant kangaroo rat at a three-to-one ratio, with additional onsite conservation. Mitigation Measure (MM) No. BR-19.1 further called for buffer zones of occupied natal dens for the San Joaquin kit fox within the construction site, and included specific guidelines to avoid disturbing occupied dens during the development process.

Save Panoche Valley may very well disagree with the evidence that the Board relied upon in making its determination that the mitigation measures would not result in a decrease in impact, but such a disagreement does not necessarily mean that the Board violated CEQA, so long as sufficient evidence supported its findings. As discussed earlier, "substantial evidence" is "enough relevant information and reasonable inferences

26

from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA Guidelines, § 15384, subd. (a).)

We therefore find that sufficient evidence existed in the administrative record supported the board's findings that the adopted measures would sufficiently reduce the harm to the species of special concern.

4. *Mitigation Lands Not Appropriate.* Save Panoche Valley finds faults with the Board's conclusion that the mitigation lands, specifically the Silver Creek Ranch and the Valadeao Ranch, are suitable for conservation. We find no merit to this claim. There is substantial evidence in the administrative record supporting the Board's determination that the mitigation lands appropriately reduced the biological impacts to species. According to the FEIR, the proposed mitigation land at Silver Creek Ranch was specifically identified in the *Recovery Plan for Upland Species of the San Joaquin Valley* in 1998 as an area with high habitats for many of the special status species in the area. Live Oak Associates surveyed Silver Creek Ranch on behalf of Solargen in August and September of 2010, and found the presence of blunt-nosed leopard lizards, loggerhead shrikes, mastiff bats, giant kangaroo rats, San Joaquin kit foxes, antelope squirrels, and American badgers. The USFWS has also previously identified the Silver Creek Ranch as a critical component for the recovery of many of the species of special concern. Additionally, Solargen sought to commit the mitigation lands to be preserved in perpetuity as conservation easements, further bolstering their ability to serve as a vehicle for conservation. Though Save Panoche Valley may have differing views as to the viability of these mitigation lands, there is sufficient evidence in the record to substantiate the Board's findings that the proposed lands are adequate.

5. *Habitat Conservation by Ratio is Insufficient.* Lastly, Save Panoche Valley further finds faults with the Board's determination that the mitigation measures to mitigate certain habitats and lands at a ratio, such as the habitat for giant kangaroo rats at

27

a three-to-one ratio, is inadequate. However, as other appellate courts have noted, "mitigation need not account for every square foot of impacted habitat to be adequate. What matters is that the unmitigated impact is no longer significant." (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1233 (*Banning Ranch Conservancy*).) There is sufficient evidence in the record that conservation of habitats through easements and other methods would mitigate the impact on the biological resources to a less than significant effect. This evidence is enough to support the Board's findings.

### *The EIR's Agricultural Analyses*

Save Panoche Valley challenges the EIR's agricultural impact analyses. The FEIR determined that construction of the project will inevitably convert some prime agricultural land to nonagricultural uses. It is Save Panoche Valley's position that the proposed mitigation measures to protect the 13,000 acres of land in and around the project site and to create agricultural conservation easements that would either cover 4,563 acres of rangeland or 285 acres of high quality cropland is inadequate. Save Panoche Valley argues that mitigation measures should minimize, rectify, reduce and eliminate impacts, which these measures fail to accomplish.

We find no merit to Save Panoche Valley's arguments on this point. "Mitigation," as defined by the CEQA Guidelines, does not necessarily mandate that the County is tasked with creating new habitats. The CEQA Guidelines provide that mitigation can include: "(a) Avoiding the impact altogether by not taking a certain action or parts of an action. [¶] (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. [¶] (c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment. [¶] (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. [¶] (e)

28

Compensating for the impact by replacing or providing substitute resources or environments." (CEQA Guidelines, § 15370.)

Substantial evidence supports the Board's determination that the mitigation measures provided would satisfy this definition of "mitigation" under the CEQA Guidelines. The mitigation measures called for creation of conservation easements. It also mandated that Solargen would be required to dismantle the project upon conclusion of its useful life, which would include disassembly of any structures and restoration of the lands. Restoration would include revegetation, and returning the agricultural soils to its original condition. These mitigation measures adequately address the potential impacts on agricultural resources, including the impact on grazing land, and adequately satisfy the requirements set forth under the CEQA Guidelines. Save Panoche Valley's insistence that the mitigation measures fail because there is no creation of *additional* agricultural lands to compensate for the ones utilized for the project site are unsubstantiated. We are unaware of any case law that supports Save Panoche Valley's position. The goal of mitigation measures is not to net out the impact of a proposed project, but to reduce the impact to insignificant levels. (See *Banning Ranch Conservancy, supra*, 211 Cal.App.4th at p. 1233.)

The same rationale applies to Save Panoche Valley's contention that the mitigation measures fail as it does not adequately address potential impact on cattle grazing. The FEIR and statement of overriding considerations provide for a mitigation measure that will introduce sheep grazing on the lands as a way to minimize impact. Save Panoche Valley argues that the introduction of sheep grazing is not a mitigation measure and is infeasible as the project site cannot support cattle grazing. However, as the EIR contemplated, the sheep-grazing plan would involve rational grazing of between 750 to 3,600 sheep in nine pastures from January to May of the year. This amounts to approximately 750 to 3,600 AUM (animal unit months). In contrast, the project site as it

29

was could support around one head of cattle per 25 acres, which represents approximately 2,345 and 3,900 AUMs. While the sheep-grazing mitigation measure may result in a total reduced number of AUMs, it nonetheless acts as a mitigation against the agricultural impact of the project.

### The Timing of the Board's Statement of Overriding Considerations

Save Panoche Valley argues that the Board's findings are not supported by substantial evidence, and that its findings are improper because the board made its statement of overriding considerations on October 12, 2010, and it did not approve the project until November 10, 2010. Save Panoche Valley argues this constitutes a legal impossibility. However, we find this argument unsupported as for the purposes of CEQA, project "approval" is broadly defined and occurs when there is a "decision by a public agency which commits the agency to a definite course of action in regard to a project." (CEQA Guidelines, § 15352, subd. (a); *Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 496.) The Board canceled the Williamson Act contracts on October 12, 2010. We find that such an action by the board constitutes a definite course of action for the project, and it amounted to an approval. In accordance, issuance of the statement of overriding considerations on that date did not amount to a legal impossibility.

### Substantial Evidence Supported the Board's Findings

Lastly, Save Panoche Valley makes the blanket argument that substantial evidence does not support the Board's findings under the CEQA Guidelines (CEQA Guidelines, § 15091, subd. (a)(1)-(3).) The Guidelines provide that an agency, prior to approving an EIR, must make one or more written findings for each of the significant effects outlined in the EIR. (*Id.* subd. (a).) The possible findings include: "(1) Changes or alterations have been required in, or incorporated into, the project which avoid or substantially lessen the significant environmental effect as identified in the final EIR. [¶] (2) Such

30

changes or alterations are within the responsibility and jurisdiction of another public agency and not the agency making the finding. Such changes have been adopted by such other agency or can and should be adopted by such other agency. [¶] (3) Specific economic, legal, social, technological, or other considerations, including provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or project alternatives identified in the final EIR." (*Id*. subd. (a)(1)-(3).)

First, Save Panoche Valley contends that substantial evidence does not support the finding that changes or alterations have been incorporated into the project which will avoid or substantially lessen the significant environmental effects identified in the FEIR. Save Panoche Valley argues that many mitigation measures are inadequate. For the reasons we set forth *ante* regarding the adequacy of the biological and agricultural impact analyses and mitigation measures, we find no merit to this argument.

Second, Save Panoche Valley argues that the board's finding that specific economic, legal, social, technological, and other considerations make infeasible other alternatives is also unsubstantiated. However, as we also determined *ante*, the Board's determination that the Westlands CREZ alternative was infeasible was properly supported by substantial evidence in the administrative record. Save Panoche Valley's contention that the Board's determination that the Solargen project site would generate jobs and create economic opportunities for the region is unsupported, fails. There is substantial evidence in the record regarding the potential for job creation. An economic impact study estimated that the solar project would create an estimated total of 771 jobs, and would generate an estimated $81 million from the additional retail impact in the County due to the increased amount of disposable income generated by salaries.

Third, we find no merit to Save Panoche Valley's argument that substantial evidence did not support the Board's conclusion that the project site does not further California's renewable energy goals. There was sufficient evidence in the record to

31

support the Board's determination that the solar project would further the state's interest in renewable energy. As noted in the comments and responses section of the project's FEIR, though the completion of the solar project would not, by itself, push the state to meet its threshold requirements of 20 percent renewable energy by 2010 and 33 percent renewable energy by 2020, every solar project developed helps California increase its overall amount of renewable energy. Save Panoche Valley in part posits that there was information before the County that the proposed solar project need not be constructed in order for the state to meet its renewable energy goals. An expert, Bill Powers, who testified before the board that he was a professional engineer, expressed the opinion that there were enough renewable energy projects in the queue, such that even accounting for failures, the state would be able to reach its renewable energy goal of 33 percent by 2020. Nonetheless, this opinion does not negate the existence of substantial evidence to support the Board's findings.

We therefore conclude that Save Panoche Valley's claim that the Board's findings were not substantiated with sufficient evidence is without merit.

### *III. Conclusion*

In sum, we find that substantial evidence in the record supported the County's cancellation of Williamson Act contracts. Additionally, we find no error with the County's certification of the EIR and with its approval of the solar project.

### **DISPOSITION**

The judgment is affirmed. The County and real parties in interest are entitled to costs on appeal.

32

_____

                    Premo, J.

WE CONCUR:


_____

        Rushing, P.J.



_____

        Elia, J.




Save Panoche Valley et al. v. San Benito County (PV2 Energy, LLC et al.)
H037599

| | |
|---|---|
| Trial Court: | Santa Benito County Superior Court<br>Superior Court No. CU-10-00220 |
| Trial Judge: | Hon. Robert A. O'Farrell |
| Counsel for Plaintiffs/Appellants:<br>Save Panoche Valley, Santa Clara<br>Valley Audubon Society, Sierra Club | Law Offices of Rose M. Zoia<br>Rose M. Zoia |
| Counsel for Defendant/Respondent:<br>San Benito County | County Counsel, Matthew W. Granger<br>Barbara J. Thompson<br>Assistant County Counsel |
| Counsel for Real Parties in<br>Interest/Respondents:<br>PV2 Energy, LLC et al. | Lombardo & Gilles<br>Jason S. Retterer |

Save Panoche Valley et al. v. San Benito County (PV2 Energy, LLC et al.)
H037599