Filed 11/27/23 Point Molate Alliance v. City of Richmond CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| POINT MOLATE ALLIANCE et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF RICHMOND et al., <br><br> Defendants and Respondents. | A164906 <br><br> (Contra Costa County Super. Ct. No. CIVMSN20-1528) |
| NORTH COAST RIVER ALLIANCE et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF RICHMOND et al., <br><br> Defendants and Respondents. | A165758 <br><br> (Contra Costa County Super. Ct. No. CIVMSN20-1528) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on October 27, 2023, be modified to delete the Disposition in its entirety and replace it with the following:

> The judgment is reversed with directions to the trial court to enter a new judgment granting the petitions and to issue a peremptory writ of mandate directing the City to set aside its certification of the final

1

SEIR and related project approvals. Plaintiffs shall recover their costs on appeal.

There is no change in the judgment.
The petitions for rehearing are denied.

Date: November 27, 2023                    BROWN, P. J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| POINT MOLATE ALLIANCE et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF RICHMOND et al.,<br><br>    Defendants and Respondents. | A164906<br><br>(Contra Costa County<br>Super. Ct. No. CIVMSN20-1528) |
| NORTH COAST RIVER ALLIANCE et al.,<br><br>    Plaintiffs and Appellants,<br>v.<br>CITY OF RICHMOND et al.,<br>    Defendants and Respondents. | A165758<br><br>(Contra Costa County<br>Super. Ct. No. CIVMSN20-1528) |

In these consolidated appeals, Point Molate Alliance, Citizens for East Shore Parks and the Sierra Club (collectively PMA) and North Coast Rivers Alliance, Pacific Coast Federation of Fishermen's Associations, Institute for Fisheries Resources, and San Francisco Crab Boat Owners Association (collectively NCRA) (together plaintiffs) challenge the City of Richmond's (City) certification of a Subsequent Environmental Impact Report ("SEIR") under the California Environmental Quality Act (CEQA) (Pub. Resources Code,[1] § 21001 et seq.) for the Point Molate Mixed-Use Development Project

_____

[1] All statutory references are to the Public Resources Code.

("Project") and the related approval of the Project. Plaintiffs contend that the SEIR is inadequate in numerous regards, and NCRA asserts additionally that the City's approval of the Project was inconsistent with the City's General Plan and that the City's approval violated the California Constitution. While we reject many of these arguments, we agree that the analysis of mitigation measures in the SEIR with respect to several environmental impacts, including impacts to tribal cultural resources and wildfire evacuation risks, is inadequate. Accordingly, we vacate the judgment denying the petitions for writ of mandate and remand for further proceedings.

## BACKGROUND

Point Molate is located in the City of Richmond, running along the southwest side of the San Pablo Peninsula on the San Francisco Bay. Point Molate consists of 412 acres, 276 of which are dry land. From the shoreline of the San Francisco Bay, the land rises to Potrero Ridge, 350 feet above sea level. Much of the hillside is overgrown with dense eucalyptus woodlands. Within Point Molate, there are 16 special-status plant species and 24 special-status animal species, including several raptor bird species.

For thousands of years, Point Molate was home to Ohlone tribal groups, and between 1870 to 1912, was used as a Chinese shrimp camp. Between 1906 and 1920, it was the site of Winehaven, the offices, processing and storage facility of the California Wine Association. In 1942, the land was sold to the United States government and was operated thereafter as a Navy base. In 1995, the Department of Defense ceased operations at Point Molate and designated the base for closure, cleanup, and reuse under the federal base closure and reuse program. Today, some Winehaven and Navy buildings remain on the property in a state of disrepair. Other than a City-owned

shoreline beach park, which includes a long pier, most of Point Molate is currently fenced off and closed to the public due to safety and contamination risks.

In 1997, the Point Molate Reuse Plan ("Reuse Plan"), prepared and approved in the federal base realignment and closure process, brought the property under the City's jurisdiction. The goals of the Reuse Plan included, among other things, preservation of open space and visual quality, long-term economic viability, promotion of public access and use, promotion of historic legacy or use, new jobs creation, minimal environmental impacts and City revenue generation. An Environmental Impact Report, also prepared in connection with the closure process, indicates that in adopting the Reuse Plan the City considered a number of mixed-use alternatives for Point Molate, including Residential/Commercial, Industrial/Commercial, and Recreation/Commercial alternatives. The preferred alternative identified in the Reuse Plan included a mixed-use historical village with housing and light industrial use. The Reuse Plan anticipated proposed development of at least 670 residential units, preservation of approximately two-thirds of the site for open space and recreational uses, and adaptive reuse of the historic buildings. The Navy transferred 85% of Point Molate to the City in 2003. and the remaining portion in 2010.

In 2004, while the transfer was pending, the City entered into a land disposition agreement granting Upstream Point Molate LLC ("Upstream") and the Guidiville Rancheria of California ("Guidiville"), a federally recognized Indian tribe, rights to acquire the site with the intention to develop a casino and resort ("Casino/Resort Project") in fulfillment of the Reuse Plan. In 2011, the City certified an environmental impact report (EIR) for the Casino/Resort Project ("2011 EIR"). Despite certifying the 2011 EIR,

the City discontinued consideration of the Casino/Resort Project after voters rejected an advisory measure supporting approval of the Casino/Resort Project.[2]

In 2012, the City amended its General Plan, designating the site as a combination of Business Light Industrial, Medium-Density Residential, Low Density Residential, Open Space, and Parks and Recreation "to reflect the conceptual land uses in the adopted 1997 Point Molate Reuse Plan." The Land Use and Urban Design element of the City's General Plan, provides, "In the former Point Molate Navy Fuel Depot area, improvements to public areas should be guided, for the most part, by the 1997 Point Molate Reuse Plan . . . . [¶] . . . [A]daptive reuse of historic buildings and new development should seek to reinforce the original rural village character of the area. . . . In general, a variety of building uses are encouraged in the private areas including entertainment, lodging and waterfront commercial." Land Use Policy LU5.2, included in the General Plan, encourages the remediation and redevelopment of the Winehaven complex at Point Molate "into mixed-use activity centers to serve a broad range of visitors and provide long-term revenue to the City."

In 2012, Upstream and Guidiville sued the City, alleging breach of the land disposition agreement for the Casino/Resort Project. In 2018, the lawsuit was settled and a stipulated federal judgment was entered. In November 2019, an amended judgment was entered. The amended judgment sets a timeframe for the City's consideration of discretionary approvals for the development of Point Molate and for the marketing and sale of identified development areas, and details how the revenue from the sales will be split

---

[2] PMA's request for judicial notice of the City Council minutes is denied for lack of relevancy.

between the City and Upstream and Guidiville. The amended judgment notes that "the Point Molate Reuse Plan designates approximately 30% as Development Areas and 70% as open space" and states that "the ratio of which shall not change." In addition, the amended judgment indicates that the City may adjust lot lines to allow for more than 670 residential units and non-residential use, insofar as the adjusted use is consistent with the overall open space preservation goals of the Point Molate Reuse Plan. Finally, the amended judgment emphasizes that the judgment is not an approval of a project and does not grant any entitlements for development at Point Molate and that the City remains responsible for compliance with all laws, statutes, and regulations, including CEQA.

In 2018, the City began a process of study and approval for a Point Molate reuse project. In March 2019, the City selected real party in interest Winehaven Legacy, LLC as the new master developer. From July 2019 through August 2020, the City issued a series of public notices—including Notices of Preparation and Completion—providing access to the Draft and Final SEIR for the proposed Project.[3]

At its September 2020 meetings, the City Council certified the SEIR and approved the Project. The Project, as approved, encompasses approximately 1,425 residential units, 374,573 square feet of rehabilitated historic structures, 250,000 square feet of mixed-use development, a fire station, and a police substation. The Project preserves roughly 70 percent of the site as open space, including recreational areas, parks, trails, and vista overlooks.

---

[3] The parties sometimes refer to the Project as the Modified Project in comparison to the Casino/Resort Project.

In October 2020, plaintiffs filed two related petitions for writ of mandate relief. They challenged the City's certification of the SEIR and project approvals. In March 2022, the trial court entered a judgment denying the petitions, ruling in favor of the City on all issues. Plaintiffs timely filed notices of appeal and by stipulation and order entered by this Court on September 2, 2022, the appeals were consolidated for all purposes.

## DISCUSSION

### 1. CEQA

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations, fn. omitted.] . . . ' "Significant effect on the environment" means a substantial, or potentially substantial, adverse change in the environment.' [Citation.] The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390–391 (*Laurel Heights I*).)

"Under CEQA, the public is notified that a draft EIR is being prepared [citations], and the draft EIR is evaluated in light of comments received. [Citations.] The lead agency then prepares a final EIR incorporating comments on the draft EIR and the agency's responses to significant environmental points raised in the review process. [Citations.] The lead agency must certify that the final EIR has been completed in compliance with

6

CEQA and that the information in the final EIR was considered by the agency before approving the project. [Citation.] Before approving the project, the agency must also find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits." (*Laurel Heights I, supra,* 47 Cal.3d at p. 391.) The requirements governing EIRs are set forth in the statute and in the CEQA Guidelines.[4]

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' [Citation, fn. omitted.] Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations, fn. omitted.] [¶] An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [City] and whether it contains substantial evidence to support the [City's] factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427 (*Vineyard*).)

---

[4] The Guidelines are found in the California Code of Regulations, title 14, section 15000 et seq.; hereafter CEQA Guidelines.

### a. Adequacy of the Project Description

"[A]n accurate, stable and finite project description is the sine qua non of an informative and legally sufficient EIR." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 199.) The project description must, among other things, describe the proposed project and provide a statement of the objectives sought by the proposed project, including the underlying purpose of the project. (*South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 332.) "Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance." (*County of Inyo*, at pp. 192–193.)

Here, the SEIR describes the Project as including two development options for Point Molate. Both options include construction of up to 1,260 newly constructed residential units, comprised of 274 single family homes, 636 low-rise apartments and townhomes and 350 mid-rise apartments and condominiums. The options also include: approximately 374,572 sq. ft. of rehabilitated existing, historic buildings; approximately 250,000 square feet of new construction; approximately 10,000 square feet for an on-site joint fire and police substation and/or other community service uses; and a 5,000 square foot terminal on the existing pier that would be accessible to water transit options, such as ferries, water shuttles, and/or water taxis. Under both options, "the remainder of the Point Molate Site would remain as open space (approximately 193.06 acres), including recreational areas, parks, trails (including an approximately 1.5-mile portion of the San Francisco Bay Trail along the shoreline), vista overlooks, and other similar spaces that are open to the public." The difference between option 1

8

and option 2 appears to be whether development within the Winehaven Historic District would be "residential-heavy" (option 1) or "commercial-heavy" (option 2). Under either option, the total potential development of the site is limited to no more than 30 percent of the total above-water area (approximately 82.74 acres).

Section 3.3 of the SEIR includes the following 12 objectives for the Project: "provide a project that is consistent with the [Base Realignment and Closure] approval and related conditions, as well as with the Navy Record of Decision for the transfer; provide a project that supports the vision of the 1997 Point Molate Base Reuse Plan; provide a variety of residential unit types to create a new residential neighborhood that serves a diverse population and helps to address the state and City's housing crisis; provide a mix of residential, retail, and restaurant uses that support each other and decrease trips compared to single-use developments; have a positive contribution to the local economy through new capital investment, the creation of new jobs, and the expansion of the tax base; balance economic development with retention and preservation of open space and the rehabilitation of historic buildings; provide open space that preserves sensitive habitat, minimize ridgeline disturbance, and provide opportunities for passive recreation; implement the portion of the San Francisco Bay Trail project along the frontage of the Project Site to increase shoreline recreational opportunities in the City; provide a mix of uses at a density sufficient to fund hazardous material remediation, substantial amounts of open space, and historic rehabilitation and adaptive reuse of the historic buildings in the Historic District; facilitate the early environmental cleanup and redevelopment and reuse of now vacant and underutilized land in an urban area; provide high-quality architecture that complements existing,

9

historic structures and incorporates sustainable design practices into new buildings and landscaping; and provide high-quality, efficient infrastructure to serve the Modified Project." Based on these objectives, the City contends the overall purpose of the Project is to promote economic redevelopment of the former naval base.

Plaintiffs contend the SEIR is inadequate because the objectives and purpose of the Project are framed so narrowly as to foreclose consideration of feasible alternatives that would "preserve all of this unique natural treasure for park use." They argue that the list of objectives "artificially places a thumb on the scales" favoring intensive residential and commercial uses rather than park and recreational uses of the site. As a result, plaintiffs' suggest, "the Project objectives preclude informed decisionmaking because they are written to preemptively eliminate a reasonable alternative to the proposed Project – in this case, regional park use – as a viable option." As plaintiffs note, the SEIR eliminates from consideration the "total parkland" alternative on the ground that it would not meet the Project's objectives, "including providing housing units and would not contribute to the local economy through new capital investment, the creation of new jobs, and the expansion of the tax base."

We find no error in the City's statement of objectives. The objectives identified in the SEIR properly set forth the scope of development anticipated by the Reuse Plan as incorporated into the City's General Plan. Plaintiffs are correct that the City was not "locked in" to any particular objective by the Reuse Plan.[5] But plaintiffs' suggestion that the purpose of the Project is to

---

[5] The Reuse plan acknowledges that "[w]hether or not residential development ultimately occurs is dependent upon the policy decision of the City of Richmond to proceed with residential development on any of the

determine anew the use of Point Molate, including transition to a total park plan, ignores the context in which the Project arose. As the parties acknowledge, the Reuse Plan was formulated with the help of a 45-member Blue Ribbon Advisory Committee, comprised of a wide variety of interest groups from the local community. There were multiple goals within the City's statement of objectives, and the City had power to prioritize and make policy tradeoffs among the originally stated goals. As the process of developing the Project evolved—with public input, as noted—it was within the City's discretion to define the Project's objectives in a manner that supported the previously determined mixed-use, open space balance envisioned by the Reuse Plan. There were many ways of striking that balance. We cannot say the approach the City took exceeded its discretion.

Plaintiffs' argument that the City improperly allowed the federal litigation to limit its discretion regarding formulation of the objectives is without merit. The final SEIR explains the impacts of the amended judgment on the formation of objectives: "The main requirements of the [amended judgment] as it relates to the development on the Project Site, include ensuring that the Modified Project on the Project Site would further the goals of the Reuse Plan; allowing for development of a minimum 670 units; setting aside approximately 70 percent of the Project Site as open space; and preserving the 374,572 SF of contributing structures within the Winehaven Historic District through adaptive reuse. [¶] While compliance with the amended judgment is not explicitly listed as a project objective, the substantive requirements of the amended judgment are incorporated into the project objectives outlined in . . . the Draft SEIR . . . . [¶] The City is bound by

suggested sites" and that "[a] number of studies must be conducted before the Plan can be finalized and/or fully implemented."

11

the terms of the Amended Judgment. However, including the above-mentioned project objectives, rather than a specific project objective of compliance with the amended judgment, allowed the City to consider a broader range of project alternatives, providing greater disclosure to the public and decision makers (Richmond City Council)." As the City argues, plaintiffs have it backwards—the amended judgment is not the original source of the open space allocation requirement; rather, the amended judgment incorporated roughly the same allocation of open-space that was required under the City's previously-adopted 1997 Reuse Plan (191 acres out of 275 total acres). Here, too, we conclude the City reasonably exercised its discretion in formulating objectives for the Project in a manner that is consistent with the Reuse Plan and the amended judgment.[6]

Finally, plaintiffs' suggestion that the objectives should have been revisited after the 2018 judgment was amended in 2019 is not persuasive. NCRA argues that "[t]he project description's intensive development bias is 'artificial' because it was driven by the City's erroneous assumption that its land use discretion was constrained by the 2018 Settlement Agreement, whose corrosive effects were never openly and retroactively repudiated and expunged by the 2019 Revised Agreement." According to NCRA, the critical

---

[6] NCRA's quotation of a comment by City staff at a public meeting in 2018 that the City must "abide by" the amended judgment does not establish an abuse of discretion. Any suggestion that the City could ignore the provisions of a federal judgment is obviously incorrect (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 734–736), but the question NCRA fails to grapple with is what the ultimate source of the guidance embodied in the judgment was. We are not dealing with a situation in which a federal court purported to dictate a policy outcome properly exercised by a municipal body, and the municipal body acceded to the overreach.

12

difference between the judgment entered in 2018 and the amended judgment is that paragraph 16 of the 2018 judgment reads, "City shall provide Discretionary City Approvals" within 24 months of the effective date and the 2019 amended judgment amends the paragraph to read, "City shall consider Discretionary City Approvals" within 6 months of the effective date.[7] NCRA argues, "Although the 2018 Agreement was amended in 2019 to revise 'shall provide' to read 'shall consider' the urban uses listed, the legacy of the original mandatory language was never effectively erased. As a direct result of the 2018 Agreement, the City had created its development-intensive 'Point Molate Vision,' chosen a developer to build it, and ultimately approved a Project that implemented it."

It appears to us that the amendment had more to do with timing than expanding the City's discretion to consider a wider range of alternatives. In this regard, both the 2018 judgment and the amended judgment include a minimum for residential development and provide that the ratio between development areas and open space "shall not change." In any event, we fail to see how either the 2018 judgment or the amended judgment improperly constrained the City's exercise of discretion in setting the project objectives.

*We Advocate Through Environmental Review v. County of Siskiyou* (2022) 78 Cal.App.5th 683, 692, cited by NCRA, is distinguishable. In that case, the court concluded that the project description was inadequate insofar as the objectives were " 'so narrow[] as to preclude any alternative other than

---

[7] "Discretionary City Approvals" is defined to mean approvals by the City "necessary to entitle development and construction of the Development Areas." As set forth above, the definition further requires that the approvals "allow for a minimum of 670 residential units and further the goals of the Point Molate Reuse Plan, including preservation of open space and rehabilitation of the Core Historic District."

the Project.' " In that case, the lead agency "largely defined the project objectives as operating the project as proposed" and the objectives "mirror[ed] the proposed project itself." (*Ibid*.) The court noted, "if the principal project objective is simply pursuing the proposed project, then no alternative other than the proposed project would do. All competing reasonable alternatives would simply be defined out of consideration." (*Ibid*.) Here, however, the project objectives were not formulated around the proposed project, but were derived from the Reuse Plan and General Plan.[8] The SEIR properly considers whether the proposed project is consistent with those objectives and, as discussed, *post*, whether an alternative would meet those objectives with less environmental impact.

### b. Selection of a Baseline

The CEQA Guidelines require that an EIR " 'include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant.' " (*Communities for a Better Environment v. South Coast Air Quality Management Dist*. (2010) 48 Cal.4th 310, 320, quoting Cal. Code Regs., tit. 14, § 15125, subd. (a), italics omitted.) In general, "the baseline for CEQA analysis must be the 'existing physical conditions in the affected area' [citation], that is, the ' "real conditions on the ground" ' [citations], rather than the level of development or activity that

---

[8] Objective 12, which reads in full "provide high-quality, efficient infrastructure to serve the Modified Project," does not establish otherwise.

14

could or should have been present according to a plan or regulation." (*Id.* at p. 321, italics omitted.)

Here, the SEIR analyzes potential environmental impacts against the existing environmental setting, which is defined by the SEIR as "the physical environmental conditions at approximately the time of the publication of the Notice of Preparation (NOP) for the Draft SEIR." For each resource, the SEIR presents the analysis of project-level and cumulative impacts for the respective resource area which includes the potential impacts as measured against the 2019 environmental setting. In addition, the SEIR "[p]rovides a summary of the conclusions of the [2011 EIR] and summarizes any changes that occurred between the certification of the [2011 EIR] and the publication of the NOP for the Modified Project." For each resource, the SEIR includes "a summary statement of how the impact compares with the findings of the [2011 EIR]."

NCRA contends the SEIR applies an improper baseline insofar as it measures potential environmental impacts of the Project by comparison to the 2011 EIR for the rejected Casino/Resort Project. They argue that "[d]oing so inherently distorted and understated the Project's impacts, since the 2011 casino project had never been approved, let alone built. The *actual* impacts of the Project when compared with the site conditions *existing in 2019* when the Notice of Preparation was published were necessarily much greater than the *hypothetical* impacts of the Project when compared with the previously proposed – but never approved let alone built – highly impactful 2011 casino project." While NCRA acknowledges that the SEIR also measures environmental impacts against existing conditions, it argues the "incessant switches" between reference points leads to an unstable baseline and "thwarts public understanding" of the impacts. We disagree. Although

unnecessary, the inclusion of the additional information regarding the 2011 EIR is not confusing.

### c. Analysis of Environmental Impacts

"The fundamental purpose of an EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment.' [Citation.] To that end, the EIR 'shall include a detailed statement setting forth . . . [¶] . . . [a]ll significant effects on the environment of the proposed project.' " (*Vineyard, supra*, 40 Cal.4th at p. 428.)

#### i. Tribal Cultural Resources

The SEIR identifies four locations containing potentially significant tribal cultural resources and describes the prior investigation of each site. The draft SEIR concluded, however, that only one of the four sites (CA-CCO-284), a shellmound containing important archaeological materials, should be considered a historic or unique archeological resource under CEQA.[9]

The draft SEIR also set out the City's outreach efforts to the Native American community as required by state and local statues. In June 2019, the City requested a list of contacts suitable for consultation from the state's Native American Heritage Commission and attempted to contact the individuals identified, but none responded. Around the same time, Guidiville requested to consult and thereafter served as a formal tribal consultant for the SEIR.

The draft SEIR finds that ground-disturbance during construction would create potentially significant impacts to the shellmound (CA-CCO-

---

[9] "Shellmounds" are Native American burial sites. (*Ruegg & Ellsworth v. City of Berkeley* (2021) 63 Cal.App.5th 277, 287.)

16

284). The draft SEIR concludes, however, the implementation of mitigation measures would reduce these impacts to less-than-significant levels "by implementing a program of construction worker training, targeted archaeological monitoring, and establishing procedures to follow in the event of a find made during construction."[10] In addition, the mitigation measures require that a tribal monitor "would be invited to observe all ground disturbing activities. Tribal monitoring would ensure that if new archaeological sites are discovered during construction a member of the tribe is available to consult on appropriate treatment."

During the public comment period, additional information was presented by members of the Confederated Villages of Lisjan (Lisjan), representing the descendants of the Ohlone community that had resided at Point Molate, regarding the existence of and preservation of tribal cultural resources at Point Molate. A Lisjan spokesperson asserted that the other

---

[10] Mitigation measure 4.4-3 requires the project proponents to retain a qualified professional archaeologist to monitor any ground-disturbing activities that occur more than 2 feet below the ground surface and within a 50-foot radius of the mapped boundaries of identified sites containing potential tribal cultural resources. Under Mitigation Measure 4.4-4, "[i]f unidentified cultural resources are encountered during ground-disturbing activities, work in the immediate area and within 50 feet of the discovery shall halt and the qualified archaeologist shall evaluate the resource's significance through a study of its features and artifacts. . . . If the find is determined to be a potentially significant . . . [tribal cultural resource], a qualified archaeologist, in consultation with the Planning Director or designee at the City of Richmond, the project proponent, and the Native American monitor . . . shall determine whether preservation in place is feasible. [¶] If preservation in place is infeasible in light of project design or layout, or is unnecessary to avoid significant effects, a Cultural Resources Data Recovery Plan (CRDRP) shall be developed by the qualified archaeologist and . . . the tribal monitor[] to outline excavation and laboratory procedures, and if appropriate, curation at a university depository or . . . other treatment considered appropriate by the tribe."

sites identified but excluded from the mitigation measures in the draft SEIR likely included intact tribal cultural resources. During consultations with the City, the Lisjan representatives stressed "the significance of the prehistoric resources, and the need for avoidance, monitoring, and other protections." The City's historic preservation commission also raised concerns that Guidiville's consultation might not be sufficient to protect the Ohlone sacred shellmounds at Point Molate because Guidiville is not included in the Native American Heritage Commission list and has a conflict of interest due to the tribes participation in the federal lawsuit. Finally, PMA submitted a comment addressing concern that while the draft SEIR includes processes that will be followed if impacts are identified during construction, these "after-the-fact processes" cannot be relied upon to mitigate impacts to tribal cultural resources.

In response to the public comments, the final SEIR modified the draft SEIR to expand application of the mitigation measures to two additional shellmounds previously determined not to qualify for protection under CEQA (CA-CCO-282, CA-CCO-283) and substituted Lisjan in Guidiville's place as the tribal consultant on the Project. With respect to PMA's objection to the proposed mitigation measures, the City responded summarily that "After-The-Fact processes are the only way to deal with mitigating impacts to as-yet unknown resources."

At the certification hearing before the City Council, two anthropologists from University of California, Berkeley (UC Berkeley) expressed their concerns about the City's treatment of the tribal cultural resources identified by Lisjan. In their written comment, they urged the City to delay certification of the SEIR to permit the use of ground penetrating radar, magnetometry, and other advanced geophysical survey methods to identify with accuracy the

18

location of subterranean archaeological resources. They argued that the additional investigations would avoid unnecessary impacts to tribal cultural resources during ground-disturbing activities.[11]

On appeal, PMA argues the City's identification of tribal cultural resources at Point Molate and the mitigation measures adopted by the SEIR are inadequate. Alternatively, PMA argues the City violated CEQA by failing to recirculate the SEIR to allow for public comment on the availability of the additional investigative methods, disclosed by the UC Berkeley anthropologists, to identify and mitigate impacts to tribal cultural resources.

In response, the City contends that it adequately identified and mitigated the Project's impacts to tribal cultural resources and that recirculation was not required. It argues that it was entitled to rely on the determination by its staff that the site had been adequately characterized by the existing documentation and that further investigation was not necessary or required and that it "had discretion to decline additional [ground penetrating radar] surveys where the existing mitigation already reduced the Project's impacts to a less-than-significant level."

Initially, we point out that there is no dispute as to the general location of possible tribal cultural resources at Point Molate. As the City points out, the SEIR references no fewer than 22 reports prepared from 1977 to 2016 assessing the Site for cultural resources and concludes that the site is "sufficiently characterize[ed]" by five modern studies which "employ[ed] survey and/or test excavations." During public comment, Lisjan and others, argued that some of the sites excluded from protection by the draft SEIR,

---

[11] The anthropologists' oral and written comments expanded on concerns expressed almost a month prior before the City Planning Commission when it met to consider its recommendation to the City Council on certification of the final SEIR.

should be covered by the mitigation measures and as noted, the final SEIR accepts these requests and extends coverage of its mitigation measures to these additional sites. PMA has failed to identify any other sites not identified or analyzed in the SEIR that may contain additional tribal cultural resources. Accordingly, the dispute centers on whether the boundaries of these added sites, and the location of resources within those boundaries, are properly identified and the impacts thereto mitigated.

The SEIR concludes that the disruption during construction of buried tribal cultural resources, including both artifacts and human remains, would be a significant environmental impact. As PMA argues, even employing the existing mitigation measures, there "remains a very real possibility that, if unanticipated [tribal cultural resources] were discovered, they would be at least displaced and perhaps also damaged in the process of unearthing and removal." In *Ruegg & Ellsworth v. City of Berkeley*, *supra*, 63 Cal.App.5th at page 287, the court observed that " '[t]he importance of . . . shellmounds should not be underestimated.' Shellmounds contain[] 'ritual burials exhibiting a variety of deliberate, traditional positioning and use of burial goods' and '[e]ven to this day, native descendants value these mounds as sacred resting sites of their early ancestors.' " In their letter to the City, the UC Berkeley anthropologists offered the following critique of the mitigation measures: "Currently, the plan provides for a 50-foot barrier around some of the [tribal cultural resources] 'to the extent feasible' and states that soil-disturbing activities may still take place within that barrier, so long as monitors are present (Mitigation Measure 4.4-7). This only allows for remediation after a [tribal cultural resource] has been disturbed at best. The mitigation measures do provide for halting construction if certain archaeological materials are encountered, but these criteria are ill-defined.

20

Most importantly, merely allowing for archaeological investigation and documentation before proceeding with construction is not the same as protecting these Sacred Sites in place, by avoidance – the only form of mitigation that sufficiently respects the concerns of the Confederated Villages of Lisjan. [¶] . . . [P]lacing barriers of any radius around these sites requires that the site boundaries be accurately defined. We have conducted some preliminary archaeological investigations using historical maps, documentary research, remote sensing techniques, and ground-truthing that has called into question the site boundaries delimited by the [prior studies]." The anthropologists explained why the prior site investigations were inadequate and suggested that "[g]eophysical prospecting, including but not limited to ground-penetrating radar (GPR) and magnetometry, should be conducted prior to any development agreement in order to delimit the boundaries" of the sites. Finally, they explained that to the extent the prior studies included excavations, "their methods were likely insufficient to prospect at the depths that they themselves state have the highest likelihood of encountering archaeological material. Geophysical methods are more suitable for 1) prospecting at these depths without excessive ground disturbance and 2) prospecting below contemporary structures (such as roadways)."

The City argues on appeal that it was not required to consider additional mitigation measures because the measures included in the draft SEIR adequately mitigated any impacts. We disagree.[12]

---

[12] Guidiville's amicus brief suggests that PMA's deficient tribal cultural resource mitigation objections were raised as a last-minute litigation tactic on September 8, 2020, the very day of the City Council hearing; that the late assertion of the issue evidences a failure to exhaust administrative remedies; and that we therefore lack jurisdiction to consider these objections at this stage in the proceedings. (*East Oakland Stadium Alliance v. City of Oakland*

21

"[A]n agency is not required to conduct all possible tests or exhaust all research methodologies to evaluate impacts. Simply because an additional test may be helpful does not mean an agency must complete the test to comply with the requirements of CEQA." (*Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 524.) Thus, the City was entitled to rely on staff's determination that, *outside shellmounds CA-CCO-282, CA-CCO-283, and CA-CCO-284,* the potential for disturbance of archeologically significant matter had already been eliminated as a risk that required recirculation, without use of ground penetrating radar, magnetometry, and other advanced geophysical survey methods to further investigate. But with respect to shellmounds CA-CCO-282, CA-CCO-283, and CA-CCO-284, which the City acknowledged as specific areas within Point Molate that contain historic or unique archeological resource under CEQA, the adequacy of before-the-fact versus after-the-fact mitigation measures—an issue comments

---

(2023) 89 Cal.App.5th 1226, 1245; § 21177.) Counsel for the City echoed this argument for the first time at oral argument. We are unpersuaded. PMA correctly points out that the deficient tribal cultural resource mitigation issues it has raised here on appeal were raised in considerable detail months before the City Council hearing, on multiple occasions. In any event, the public's role in the environmental review process does not end when the public comment period expires. (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1201.) "[I]f a public hearing is conducted on project approval, then new environmental objections could be made until close of this hearing. [Citations.] If the decision making body elects to certify the EIR without considering comments made at this public hearing, it does so at its own risk. If a CEQA action is subsequently brought, the EIR may be found to be deficient on grounds that were raised at any point prior to close of the hearing on project approval." (*Ibid.,* citing § 21177, subdivision (a) [alleged grounds for noncompliance with CEQA must be "presented to the public agency orally or in writing by any person during the public comment period provided by this division or before the close of the public hearing on the project before the issuance of the notice of determination"].)

22

by Lisjan and PMA clearly raised, without meaningful response—is another matter. For these shellmounds, consideration needed to be given to whether advanced ground penetrating methods of detection could feasibly be done.

Under CEQA, "public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (§ 21002.) CEQA procedures "are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." (*Ibid.*) "Where several mitigation measures are available to mitigate an impact, '*each should be discussed* and the basis for selecting a particular measure should be identified.' " (*League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 160, quoting [CEQA] Guidelines, § 15126.4, subd. (a)(1)(B), italics added.) " 'In keeping with the statute and guidelines, an adequate EIR must respond to specific suggestions for mitigating a significant environmental impact unless the suggested mitigation is facially infeasible. [Citations.] While the response need not be exhaustive, it should evince good faith and a reasoned analysis." (*Id.* at p. 160.)

Here, Lisjan and the UC Berkeley anthropologists proposed an additional mitigation measure, and explained why it was necessary and how it would increase protection for tribal cultural resources. Indeed, the use of ground penetrating radar to locate buried tribal cultural resources is not novel. (See *Ruegg & Ellsworth v. City of Berkeley*, *supra*, 63 Cal.App.5th at p. 291 [noting conclusion in draft EIR that use of archaeological survey with ground penetrating radar to identify areas most likely to yield shellmound material would, along with other measures, reduce potential impacts to a

less-than-significant level].) Although the City is correct that " ' " 'CEQA does not require analysis of every *imaginable . . .* mitigation measure' " ' " (*Gilroy Citizens for Responsible Planning v. City of Gilroy* (2006) 140 Cal.App.4th 911, 935), the proposed measure at least arguably would prevent disturbance of tribal cultural resources during construction and was not infeasible on its face. Accordingly, the City's failure to consider the additional proposed mitigation measure constitutes a prejudicial abuse of discretion.[13] (*League to Save Lake Tahoe v. County of Placer, supra*, 75 Cal.App.5th at p. 162.)

### ii. *Osprey Nesting Sites*

The SEIR discusses the presence of osprey, a species of special concern under state law, on the site and notes specifically that osprey and osprey nests were both observed during surveys for the Project. The SEIR concludes that "[n]est disturbance from construction noise or other activities has the potential to result in abandonment or destruction of nests. This is considered a potentially significant impact. Mitigation Measure 4.3-5 would reduce impacts to special-status birds and their nests by requiring pre-construction surveys to identify active nests within and in the vicinity of groundbreaking activities and the implementation of buffers determined by a qualified

---

[13] In light of this conclusion, we do not resolve PMA's argument that recirculation of the SEIR was required. Under *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123–1125, recirculation of an EIR is required "[i]f the lead agency adds 'significant new information' to the EIR subsequent to the close of the public comment period but *prior* to certification of the final EIR." (See also CEQA Guidelines, § 15088.5, subd. (a)(1) & (3) [recirculation is required where final EIR discloses a feasible mitigation measure "considerably different from others previously analyzed" that would "clearly lessen the significant environmental impacts of the project"].) We note that had the City discussed but rejected the additional mitigation measure in the final SEIR, a question would have arisen as to whether this was significant new information requiring recirculation. We offer no opinion on that question.

biologist with incorporation of the appropriate agency guidance and/or consultation to ensure that buffers are of an appropriate size to reduce impacts. Mitigation Measure 4.10-1 describes noise-reducing practices consistent with acceptable noise levels in the City that would additionally reduce disturbance to wildlife from noise produced by construction activities. Identification of active nests and establishment of suitable buffers accounting for anticipated levels of construction disturbance protects against accidental nest destruction and reduces the likelihood that disturbance levels would result in nest abandonment. Implementation of Mitigation Measures 4.3-5 and 4.10-1 would reduce impacts to nesting birds to a less-than-significant level."

On appeal, PMA contends this analysis is insufficient because it fails to identify, evaluate, and mitigate other potential impacts to osprey nesting habitat at Point Molate. They note that mapping of nesting sites at Point Molate in 2020 shows that osprey tend to nest in tall trees or utility poles along the shoreline where they have easy access to forage in the open water. They argue that nesting habitat near the pier would be permanently impacted (1) as a result of "extensive human activity in close proximity – e.g., ferries or water taxis docking at the pier" and (2) by the removal of trees during planned roadway expansion along the shoreline. They conclude that the SEIR is inadequate insofar as it fails to address the significant reduction in nesting habitat.

An EIR must identify and discuss "all significant effects on the environment" of a proposed project. (§ 21100, subd. (b)(1); CEQA Guidelines, § 15126, subd. (a).) A significant environmental effect is "a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) In response to public comments on the failure of the SEIR to adequately identify

25

or protect nesting habitat for species of special concern, the City concluded that any potential impacts to habitat in general, as compared to impacts to active nests, would not be significant. The City noted that because the Project retains approximately 70 percent of the land-base of the site as open space, a vast majority of undisturbed habitat, including nesting habitat, would remain as open space. The City also noted elsewhere in the SEIR that non-native eucalyptus trees would be replaced with native species trees at a rate of 2:1 and that because the habitat range for osprey extended far beyond Point Molate,[14] the removal of some non-native eucalyptus trees would involve an "extremely insignificant amount of foraging and nesting habitat." The response to comments emphasizes that the site does not contain any critical osprey nesting habitat.

Even without the point about the broad geographic range of osprey nesting habitat, the analysis in the SEIR regarding the possible loss of nesting habitat as a result of the removal of some trees is sufficient. Although the SEIR does not address specifically the removal of trees along the shoreline, it adequately explains why any reduction in overall nesting habitat at Point Molate would not be considered significant. Substantial evidence supports the City's determination. As the trial court observed upon review of the administrative record, "it is clear that much of the eucalyptus will remain

[14] In its brief responding to PMA, the City stated that, as explained in the SEIR, "the habitat range for osprey spans the entire United States." When PMA challenged this at oral argument (the record citation supplied in the City's responding brief concerns another species of bird), the City acknowledged a degree of overstatement and claimed (without citation to the record) that the habitat range for osprey extends from the Pacific Northwest coast to the coast of South America. This dispute is not relevant to our resolution of the osprey nesting site issue.

in the undeveloped areas." The trial court also found, with record evidence support, that "[t]he Final SEIR . . . discusses the habitat for each species and none of the habitats are exclusively eucalyptus."[15] "In addition," the court found, here again with record support, because "the record does not show that [osprey] require trees of a specific height[,] . . . PMA has not shown that the replacement [of] eucalyptus trees with native trees will result in the loss of habitat for the [osprey]."

While the SEIR does not address the potential impacts of human activity at pier on active nests, it does not appear that objection was raised, as required, during the administrative proceedings. In *East Oakland Stadium Alliance v. City of Oakland*, *supra*, 89 Cal.App.5th at page 1245, the court explained, " ' " 'In order to attack a decision that is subject to CEQA, the alleged grounds for noncompliance must have been presented to the public agency . . . .' " " '[T]he objections must be sufficiently specific so that the agency has the opportunity to evaluate and respond to them.' " ' " Here, the only comment letter cited by PMA on appeal relays the value of the south watershed area of Point Molate as osprey nesting grounds and suggests that the "proposed construction" in the southeastern portion of the site would result in loss of much of the most valuable habitat on the peninsula. The comment's references to proposed construction and development generally are not sufficient to put the City on notice as to potential impacts from increased human activity at the pier.

---

[15] For example, raptors nest in a variety of habitats besides eucalyptus trees, including oaks or cottonwood, on snags and dead topped trees, or even wooden posts similar to utility poles in disturbed areas.

### iii. Emergency Evacuations/Wildfire Safety

In *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 377–378, the court held that "when a proposed project risks exacerbating . . . environmental hazards or conditions that already exist, an agency must analyze the potential impact of such hazards on future residents or users. In those specific instances, it is the *project's* impact on the environment—and not the *environment's* impact on the project—that compels an evaluation of how future residents or users could be affected by exacerbated conditions." Noting that "CEQA calls upon an agency to evaluate existing conditions in order to assess whether a project could exacerbate hazards that are already present," the court upheld the requirements in the CEQA Guidelines that an EIR " 'analyze any significant environmental effects the project might cause by bringing development and people into the area affected' " and " 'evaluate any potentially significant impacts of locating development in . . . areas susceptible to hazardous conditions (e.g., floodplains, coastlines, wildfire risk areas) as identified in authoritative hazard maps, risk assessments or in land use plans addressing such hazards areas.' " (*Id.* at p. 388.) The court emphasized that the above requirements "are valid to the extent they call for evaluating a project's potentially significant *exacerbating* effects on existing environmental hazards—effects that arise because the project brings 'development and people into the area affected.' " (*Ibid.*)

The Project is located within a "Very High Fire Hazard Severity Zone" as designated by the City of Richmond Fire Department. The SEIR states, "The Project Site is characterized by the presence of several vegetative communities, including annual grassland, coastal scrub, mixed riparian, eucalyptus woodland, and invasive scrub. Moderate on-site fuel loading from

28

dead organic debris was observed during preparation of this SEIR related to eucalyptus woodlands and associated ladder fuels. The resultant fuel loading on the Project Site increases the risk of significant loss, injury, or death involving wildland fires resulting in a potentially significant impact." The SEIR also explains "Stenmark Drive is the only vehicle access to the Project Site and would therefore be used should an emergency occur during operation of the Modified Project. If Stenmark Drive is an evacuation route for others on the San Pablo Peninsula, then the additional evacuation traffic from the Project Site could impede this evacuation route for others on the San Pablo Peninsula. This would result in a potentially significant impact." The SEIR concludes, however, that with mitigation, including implementation of a wildfire emergency response plan (WERP) (Mitigation Measure 4.7-3) and implementation of an emergency response plan (ERP) (Mitigation Measure 4.7-1), the impacts will be reduced to less than significant.

Mitigation Measure 4.7-1 provides, "Prior to the issuance of the first building permit, a site-specific ERP will be developed under the Modified Project to ensure safe evacuation of the Project Site during an emergency in a manner that does not interfere with existing evacuation plans and procedures for sheltering in place. The ERP shall identify protocols for evacuation and recommendations regarding emergency supply kits and HEPA filter masks that can be accessed in the case of an earthquake, wildfire, and chemical release. The ERP shall require that the Project Site include a warning system and identify the location of warning devices, such as sirens, on the Project Site and describe how the warning system would be integrated with the Contra Costa Health Services (CCHS) and Community Warning System (CWS). The ERP also shall identify the locations of appropriate refuge areas and emergency evacuation routes, and will address the need for one or more

29

places where people can shelter-in-place as a contingency to evacuation. The ERP shall require community informational sessions to inform citizens of the evacuation procedures, refuge locations, and shelter-in-place procedures and how to appropriately respond during an emergency. Furthermore, signage will be posted on the Project Site that will inform residents and visitors of the location of refuge areas and places to shelter in place. The ERP also shall require the Project proponent to coordinate its emergency plans with CCHS to ensure an adequate level of emergency preparedness for Project Site visitors. Additionally, the ERP shall require the Project proponent to coordinate with the Water Emergency Transportation Authority (WETA) to provide emergency response planning and coordinated water-escape services."

Mitigation Measure 4.7-3 provides, "Prior to issuance of the first building permit, a site-specific WERP shall be developed by qualified personnel with expertise in wildfire management and in coordination with the Richmond Fire Department. This WERP shall have pre- and post-wildfire response measures. The pre-wildfire response measures shall include actions to reduce damage to property anticipated from wildfire events and ensure evacuation routes are kept clear (e.g. sandbags to mitigate possible landslide and flood damage). The post-wildfire response measures will include fire suppression damage repair and emergency stabilization measures. Fire suppression damage repair could include immediate actions to minimize soil erosion impacts resulting from fire suppression activities that can occur before the wildfire is completely contained. Emergency stabilization could include identifying impending threats to safety and property and then actions immediately implemented to mitigate these identified threats. These actions could include the installation of water run-off and erosion control structures,

30

removal of burnt vegetation, and installation of warning signs. [¶] The WERP will also include standards for a five-year long-term recovery and restoration plan to rehabilitate any burned areas. These measures could include restoring burned habitat, reforestation, monitoring fire effects, and treating noxious weed infestations. This would be prepared by qualified personnel with burned area restoration expertise and in coordination with and to the approval of the Richmond Fire Department. Prior to the issuance of the first building permit, the WERP shall be submitted to the Richmond Fire Department for review and approval."

Plaintiffs contend the analysis of wildfire hazards and proposed mitigation measures are inadequate. NCRA argues, "The Project will increase the risk of fire ignition by bringing in thousands of residents, workers and customers, and the risk of harm to property, people, and the environment when a wildfire foreseeably erupts. This impact cannot be mitigated to less-than-significance by wishful thinking, especially when relying on likewise hypothetical Emergency Response Plans that have not even been developed." PMA argues the mitigation measures are inadequate insofar as the evacuation plans do not adequately address the single-lane freeway ramps that provide the only access to and from Point Molate, which they assert are inadequate to handle traffic in an emergency. They explain that "the single-lane entry ramps onto I-580 constitute a 'bottleneck' that would severely restrict the ability to evacuate the thousands of people who might be on the Project site, plus people who live or work further west on the San Pablo Peninsula."

NCRA's argument that the SEIR fails to address the increased ignition risk purportedly caused by the increase in human population is not persuasive. At a hearing before the City planning commission, Winehaven's

31

wildfire consultant was asked how the increased human presence would affect the likelihood of fire. After acknowledging that the majority of fires in California are "human caused," the consultant noted that there is no research that suggests that a planned community, which includes all of the "ignition resistant features" included in the Project, increases fire ignition risks. He opined that, to the contrary, that Project features like the wildfire buffers both protect structures from wildfires and also help "keep accidental fires that may occur in somebody's backyard from escaping into those wildlands." NCRA does not address or acknowledge the expert's opinion. Nor does it provide contrary evidence to support its assertion that the introduction of "thousands of people, hundreds of vehicles and massive new urban facilities" will introduce new wildfire ignition risks. The City was entitled to accept the expert's opinion that increased human population will not increase wildfire ignition risks given the "ignition resistant features" included in the Project.

The SEIR states, "The City Zoning Ordinance, as discussed in Section 4.7.2.3, has regulations set forth for new developments and existing buildings in Very High Fire Hazard Severity Zones. These regulations include a buffer zone that must be 100 by 30 feet, building standards for reducing fire risk (e.g., slanted roofs to prevent vegetation debris accumulation and fireproofing), and vegetation management for reducing fuel loads, specifically referring to City Resolution 192-95. Resolution 192-95 details specific vegetation management standards, including ornament planting with low-risk fire plants, fuel reduction measures, disposal requirements for vegetation, and more. Such landscaping and fuel management can help to mitigate fire risk. During implementation of the [Project], all regulations pertaining to developing and maintaining development in a Very High Fire Hazard Severity Zone would be adhered to. Furthermore, fuel reduction

32

measures would be included in the Open Space Plan required by Mitigation Measure 4.3-13. When fuel loading from dead and dying trees are managed as part of a plan and not allowed to accumulate, fires risks are greatly reduced." Winehaven's wildfire consultant, on which the City relies, concluded that the Project requirements to reduce fuel loads and comply with the above regulations designed to reduce fire risk would help reduce the existing risk of wildfire ignition at Point Molate.

While the record supports the City's conclusion that the Project will not increase wildfire ignition risks, there is no dispute that "[d]eveloping new homes and stores in a very high fire hazard area risks exacerbating the hazard by putting more people and property in harm's way . . . . The development increases the number of people who may need to be rescued, rendered aid, and evacuated and the amount of property that may need to be protected." (*League to Save Lake Tahoe v. County of Placer, supra*, 75 Cal.App.5th at p. 136.) Plaintiffs contend the emergency response plans, identified in the SEIR as mitigating this impact, violate CEQA's proscription against deferred mitigation measures. We agree.

"Generally, ' "[i]t is improper to defer the formulation of mitigation measures until after project approval; instead, the determination of whether a project will have significant environmental impacts, and the formulation of measures to mitigate those impacts, must occur *before* the project is approved." [Citation.]' [Citations.] '[A]n exception to this general rule applies when the agency has committed itself to specific performance criteria for evaluating the efficacy of the measures to be implemented in the future, and the future mitigation measures are formulated and operational before the project activity that they regulate begins. [Citation.]' [Citation.]" (*Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 686.)

33

Thus, deferred mitigation is permissible when (1) it is known to be feasible, (2) it is not feasible to set forth specific mitigation measures in the EIR, and (3) the EIR articulates specific performance criteria for future mitigation measures. (*Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 94, 92 ["An EIR is inadequate if '[t]he success or failure of mitigation efforts . . . may largely depend upon management plans that have not yet been formulated, and have not been subject to analysis and review within the EIR' "].) "When an agency defers formulation of a mitigation measure, it should explain why deferral is appropriate. Deferral can be found improper if no reason for it is given." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2023) § 14.12, p. 14-23; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 671 [EIR deficient where no reason provided for deferral of mitigation measures to future management plan].)

Here, Mitigation Measures 4.7-1 and 4.7-3 provide only the most general direction for adoption of emergency response plans and include no performance criteria to guide formulation of the plans or demonstrate that mitigation of the impact is feasible. At oral argument, when pressed on the lack of specificity in the proposed language addressing emergency response to a wildfire, the City pointed to the language in Mitigation Measure 4.7-1 providing that "Prior to the issuance of the first building permit, a site-specific ERP will be developed under the Modified Project to ensure safe evacuation of the Project Site during an emergency in a manner that does not interfere with existing evacuation plans and procedures for sheltering in place." Simply stating that future site-specific measures for safe evacuation must preserve the effectiveness of one element of an existing safety plan does not cure the improper deferral problem here.

34

In addition to the vagueness of its wildfire emergency planning mitigation measures, the City provides no explanation for why the plans could not have been formulated earlier in the planning process. Indeed, the final SEIR includes a draft WERP and draft ERP and the City's response to comments indicate that the drafts have been reviewed by the City Fire Marshall and were, at that time, undergoing only "minor refinements." The preparation of draft plans for inclusion in the final SEIR would suggest that there are no practical or other considerations that prohibited the City from devising such measures earlier in the planning process. Insofar as this matter must be remanded to allow for consideration of the additional proposed mitigation of impacts to tribal cultural resources, we conclude that the City should at the same time provide for public comment on an adequately formulated set of emergency response plans.

### iv. Eelgrass

According to the SEIR, "Eelgrass are submerged aquatic species adapted and highly specialized to life in the marine environment. . . . [¶] Eelgrass in the Bay serves as not only an important role in the food web, but additionally as a moderator of ocean pH and carbon sink. Point Molate supports one of the most stable eelgrass beds in the Bay and has served as an important source of eelgrass for restoration projects in other areas. While the species of eelgrass found within the Project Site are not special-status species under CEQA . . . , eelgrass beds are considered a sensitive habitat type by the [National Marine Fisheries Service (NMFS)]." The SEIR states that while no eelgrass beds would be removed as a result of the Project, indirect impacts "to eelgrass from use of the pier or from runoff generated by the [Project] would be considered significant. Potential impacts may result from water quality of runoff causing increased turbidity and pollution load." The SEIR also

acknowledges that "artificial lighting associated with construction and operational activities has the potential to impact wildlife behavior within the eelgrass and therefore the eelgrass itself." The SEIR concludes, however, that with implementation of mitigation measures, including Mitigation Measures 4.3-4 (eelgrass protection & monitoring plan), and 4.3-6 (nighttime lighting plan), the impacts to eelgrass beds would be reduced to a less than significant level.

NCRA contends the SEIR improperly defers mitigation of the potentially significant impacts to eelgrass because the eelgrass monitoring and nighttime lighting plans have not been developed. NCRA's opening brief argues rather summarily that "Mitigation Measure 4.3-4 calls for future development of an eelgrass monitoring plan. But without knowing the components of that plan, the public and decisionmakers cannot possibly evaluate its potential efficacy. And, without facts demonstrating that particular hypothetical mitigation measure's efficacy, the public cannot reasonably be asked to approve a project that poses a substantial risk to those irreplaceable eelgrass beds. That plan – or at least, specific performance criteria sufficient to assure its efficacy – must be developed prior to project approval so that the public and decision makers can weigh the effectiveness of that mitigation measure on the Project's significant impacts."

With respect to the nighttime lighting plan, NCRA argues, "The measures included in the mitigation discussion are general goals and objectives and not specific performance measures. . . . [T]he mitigation measure prohibits outdoor lighting known to attract birds, up-lighting, and light spillage onto the beach and bay. It calls for shielded lights, motion sensors, and programmable lights, and limits any non-safety related lighting between the hours of 11 p.m. and 7 a.m. These are not standards to be met;

these are measures, albeit general, to be taken. The public and decisionmakers were denied the opportunity to evaluate an actual, enforceable mitigation measure, because the SEIR claimed the nighttime lighting plan could not be completed during the review process. But completing that plan was both feasible and practical, as evidenced by the list of general measures that are required in the plan."

The City argues initially that NCRA failed to exhaust the issue of deferred mitigation for the eelgrass monitoring plan. Alternatively, it argues that the SEIR did not improperly defer the formulation of either mitigation measures.

Without addressing the exhaustion requirement, we conclude that the eelgrass monitoring plan included in Mitigation Measure 4.3-4, is not improperly deferred mitigation. First, as the City notes, Mitigation Measure 4.3-4 includes several "direct and complete" measures not challenged by NCRA. The measure requires, among other things, that (1) the Project proponent completely avoid all eelgrass during the construction and operation of the Project by instituting a 1,000-foot buffer between water vessels and eelgrass habitat as identified in preconstruction and annual surveys; (2) the existing pier be utilized and the total surface area of the pier not increased; (3) dust control measures be implemented during construction to avoid debris in the Bay; and (4) water vessel routes be limited to the deep-water shipping channel, speeds be limited to no more than 10 knots within 750 feet of the pier and signs and/or buoys be placed to keep marine traffic from eelgrass.

Insofar as the measure requires creation of a monitoring plan, it requires that "eelgrass surveys be conducted immediately prior to construction, annually throughout construction, and three years following the

37

initial use of the pier to ensure ship travel routes do not impact eelgrass. Surveys shall be conducted pursuant to protocols outlined in the California Eelgrass Mitigation Policy and Implementing Guidelines, and shall document eelgrass distribution and density on both the Project Site and at a suitable control site during the eelgrass growing season. Results of surveys shall be provided to the NMFS Santa Rosa office staff within 60 days of completion. If NMFS determines the Modified Project actions have adversely impacted eelgrass in or adjacent to the Project Site based on pre- and post- work distribution and density surveys, an eelgrass mitigation plan shall be provided to NMFS for review and approval within 60 days of the determination of adverse impacts."

The plan shall also "provide for no net loss of habitat function" and requires that the plan include criteria consistent with the California Eelgrass Mitigation Policy and Implementing Guidelines (NOAA, 2014) as well as one or more of the following: In-kind creation, restoration, or enhancement of habitat with a success ratio following three years of monitoring at or exceeding 1.2:1; Purchase of mitigation credits from an established and NMFS-approved eelgrass mitigation bank at a ratio of 1:1 for banks established over three years; Purchase of mitigation credits from a NMFS-approved eelgrass mitigation bank at a NMFS-approved ratio exceeding 1:1 for banks that have been established less than three years; or Out-of-kind mitigation only in the circumstance that in-kind mitigation is not feasible, and out-of-kind mitigation provides for sufficient ecological benefits approved by NMFS and other trustee agencies such as California Department of Fish and Wildlife.

Although no explanation is offered for why the plan could not be developed in time for circulation with the SEIR, the SEIR includes adequate

performance criteria for adoption of a subsequently developed plan and sufficient information to conclude that mitigation is feasible.

With respect to the nighttime lighting plan, Mitigation Measure 4.3-6 reads, "The plan shall describe measures to avoid and/or minimize impacts to shorebirds and migratory birds as well as sensitive eelgrass habitat from nighttime lighting. The nighttime lighting plan shall consider Dark Sky Initiative measures in reducing the impacts of nighttime lighting. The lighting plan shall include, but not be limited to the following provisions. [¶] Outdoor lighting known to attract shorebirds and migratory birds (e.g., searchlight advertising lighting, uplighting on signs, spotlights, floodlights, etc.) shall be prohibited. [¶] No up-lighting shall be allowed. [¶] Nighttime lighting or spillage of light onto beach strand and Bay waters shall be prohibited. [¶] All lighting fixtures associated with the development of the Modified Project shall be shielded, provide maximum efficiency, and reduce spill over through cut-off mechanisms (i.e., light that spills beyond the intended areas to be lit, but that is not projected directly upward). [¶] Lighting shall be deliberately directed downward and away from marshes and beaches, and optimize daylight by turning off when daylight provides sufficient illumination for vision and safety. [¶] Motion-sensitive lighting, lower intensity lights, and appropriately programmed timed lights shall be used to the maximum extent feasible. [¶] All outdoor lights other than those required for safety or security shall be off from the hours of 11 p.m. to 7 a.m. Lighting required for safety and security, such as pathway illumination and parking lot lighting, shall be designed to reduce light spillage and shall be of the minimum intensity to serve the purpose of illumination. [¶] Nighttime security lights shall be full cut off lights. Illumination shall be kept as low as possible while still providing the required security and safety illumination.

39

[¶] All lighting shall comply with the [City's Municipal Code] as applicable."
The 4-page nighttime lighting plan, which was attached to the Final SEIR,
includes and expands upon the above requirements.

Again, we question why this plan could not have been prepared and
included in the draft SEIR and no explanation is offered for its belated
preparation. However, insofar as the plan primarily incorporates the
requirements identified in Mitigation Measure 4.3-6 and no one has
suggested those measures are inadequate, we find no error.

> v. *Open Space Plan*

Mitigation Measure 4.3-12 calls for the creation of an open space plan
"for the proposed open space and shoreline park that would be held in
ownership by the City. The Plan shall act as a guide in implementing
mitigation related to sensitive habitat preservation, creation, and restoration.
The Open Space Plan shall additionally act as a binding agreement between
the Applicant and the City to identify final impacts following lot
development, to locate mitigation areas, and to assure completion of
mitigation by the Applicant. The Open Space Plan shall include, at a
minimum, the following. [¶] Approved activities within Open Space. These
activities shall be predominantly passive and include activities such as
maintenance, monitoring, and public access along dedicated trails.
[¶] Maintenance activities of trails such that trails are clearly defined and are
not overgrown with foliage. These activities shall be designed to promote
visitors to stay on pathways and to reduce the likelihood of disturbing
sensitive habitat. [¶] Compliance with the tree removal permits and Urban
Greening Master Plan requirements on City land. [¶] A description of any
habitat preservation, creation, or restoration completed within Open Space

for coastal scrub, coastal terrace prairie, mixed riparian, seasonal wetland, or ephemeral drainage habitats. This shall include a final statement of Modified Project impact acreages by habitat type, and a map clearly defining where preservation and mitigation areas are located. [¶] To the degree feasible, the Open Space Plan shall emphasize the removal of invasive plants, and their replacement with native plant species. Replacement plant species shall emphasize the use of locally rare, culturally significant, or ecologically important species." The measure requires that "[a] qualified biologist shall prepare the Open Space Plan, and a qualified biologist shall perform any recommended monitoring, reporting, and adaptive management recommendations to reach performance criteria as they relate to the Open Space Plan and sensitive habitat mitigation required for the Modified Project."

NCRA contends Mitigation Measure 4.3-12 violates CEQA's proscription against deferred mitigation measures. Initially, the City argues that NCRA failed to properly brief this issue in the trial court and thus has not preserved the issue for consideration on appeal. As the City notes, the trial court found that NCRA's argument that the SIER improperly defers mitigation as to the creation of the Open Space Plan was "not properly briefed in the moving papers." On appeal, NCRA's briefing on this issue remains limited. Nonetheless, based on our review of the SEIR we conclude that Mitigation Measure 4.3-12 is not improperly deferred mitigation.

Initially, the parties disagree as to whether the to-be-developed Open Space Plan is required mitigation for a specific impact or whether it is "a compendium of other mitigation measures, and is not itself required to reduce any specific impact of the Project." Insofar as the Open Space Plan is identified as a specific mitigation measure only in regard to potential impacts

41

to coastal scrub habitat, we consider the sufficiency of the measure in that context.

"Coastal scrub habitat is scattered throughout the Project Site, though it is most concentrated within the southeastern portion. This habitat type encompasses approximately 58.2 acres or 14.2 percent of the Project Site." "Of a total 58.2 acres of coastal scrub, 16.8 acres (28.8 percent) are within a Planning Area. An additional 8.8 acres (15.2 percent) of coastal scrub may be impacted through the grading phase of development but is scheduled to be within open space following construction. Due to restriction on overall development to a maximum 30 percent of terrestrial habitat, it is likely that not all coastal scrub within a Planning Area or grading area would be permanently converted. Although 56.0 percent of this habitat type is outside of a Planning Area or grading area and would not be permanently converted, the potential permanent loss and disturbance throughout grading of coastal scrub within a Planning Area or grading area would be a significant impact." The SEIR concludes that implementation of Mitigation Measures 4.3-11 (Coastal Scrub Habitat Impacts) and 4.3-12 (Dedicated Open Space) would reduce the potential impact to a less than significant level.

Mitigation Measure 4.3-11 requires removal and replacement of invasive scrub species with native coastal scrub species from 12.7 acres of open space and preservation of the remaining 32.6 acres of coast scrub habitat within the open space area. The measure further provides that impacts coastal scrub habitat within the planning area be "mitigated at a 1.5:1 acre ratio, such that for each acre impacted, no less than 1.5 acres of in-kind habitat shall be created, restored, or preserved." In addition, the measure provides, "Coastal scrub mitigation areas shall be managed and monitored for a total of five years to remove and prevent the further

42

encroachment of invasive scrub. A qualified biologist shall prepare an annual report on the status of preserved habitat with recommendations on adaptive management for invasive species as necessary. . . . Specific management and maintenance procedures shall be included within the Open Space Plan identified by Mitigation Measure 4.3-12." As set forth above, the Open Space Plan requires a description of any habitat preservation, creation, or restoration completed within Open Space for coastal scrub habitat, including a map clearly defining where preservation and mitigation areas are located.

These measures combined adequately mitigate potential impacts to coast scrub habitat. Measure 4.3-11 supplies the necessary requirements and criteria for the management and maintenance procedures required by the Open Space Plan. In addition, the SEIR includes a reasonable explanation for delayed preparation of the plan: It must "identify final impacts following lot development" and "locate mitigation areas" based thereon.

### vi. *Design Guidelines for the Winehaven Historic District*

The Winehaven Historic District was listed on the National Register of Historic Properties in 1978. The SEIR concludes that the rehabilitation, alteration, or relocation certain existing buildings in the Winehaven Historic District and the introduction of new construction within the Winehaven Historic District could result in significant environmental impacts. The SEIR concludes, however, that implementation of Mitigation Measure 4.4-2 (Winehaven Historic District Design Guidelines) would reduce the impacts to a less than significant levels.

Mitigation Measure 4.4-2 required the Project applicant to "develop comprehensive Design Guidelines that comply with the Secretary of the Interior's Standards and Guidelines for the Treatment of Historic Properties that will govern the rehabilitation of buildings within the Historic District as

43

well as new construction within the Historic District." It includes twelve specific provisions designed to protect the historic district. The design guidelines were drafted and then approved by the City's historic preservation committee in July 2020. The guidelines were then approved by the City Council in connection with certification of the final SEIR.

NCRA does not dispute the design guidelines approved by the City adequately mitigate potential impacts to the historic district. It claims, however, that the City's development of final design guidelines before the Project was approved demonstrates that it was neither impracticable nor infeasible to develop them as part of the SEIR. NCRA argues that the City's "decision to release these design guidelines *after* public review was complete subverts CEQA's informational mandate and its goal of open and transparent environmental review." We disagree. Here, too, we have another mitigation measure that could have included in the draft SEIR and no explanation has been offered for its belated release after public review was complete. Nonetheless, on the merits we must agree with the City. Mitigation Measure 4.4-2 encompasses detailed prescriptions for the protection of the existing Winehaven Historic District, and no argument has been advanced as to why those guidelines are inadequate.

### vii. Inconsistencies with General Plan

The CEQA Guidelines require that an EIR "discuss any inconsistencies between the proposed project and applicable general plans, specific plans and regional plans." (CEQA Guidelines, § 15125, subd. (d).) Because the City determined the Project was consistent with its General Plan, no inconsistencies are identified and discussed in the SEIR.

In *The Highway 68 Coalition v. County of Monterey* (2017) 14 Cal.App.5th 883, 893–894, the court held that where a determination has

been made that a project is consistent with the applicable general plan, no analysis in the EIR is required. " 'Because EIRs are required only to evaluate "any *inconsistencies*" with plans, no analysis should be required if the project is consistent with the relevant plans.' " The court continued, "[T]he issue of whether a proposed project is consistent with a county's general plan is not a CEQA issue, and therefore the mandate procedures provided for CEQA violations at section 21168.9 do not apply." (*Id*. at p. 893.) Rather, " 'the agency's decisions regarding project consistency with a general plan are reviewed by ordinary mandamus.' " (*Id*. at p. 894.)

The City's determination that the Project is consistent with its General Plan is discussed *post*. Insofar as we conclude that the City did not err in determining that the Project is consistent with the General Plan, no further analysis was required in the SEIR.

### d. Failure to Consider Alternatives

An EIR must "describe a range of reasonable alternatives to the project . . . which would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project." (CEQA Guidelines, § 15126.6, subd. (a).) "However, an EIR need not consider every conceivable alternative to the project." (*San Franciscans for Livable Neighborhoods v. City and County of San Francisco* (2018) 26 Cal.App.5th 596, 632.)

NCRA contends that the SEIR fails to examine a reasonable range of feasible alternatives that would reduce the Project's impacts to insignificance. It argues that the "most obvious deficiency in this respect" is the SEIR's failure to consider securing public fundings for acquisition of the site for a regional or state park. Additionally, it argues that the open space alternatives analyzed in the SEIR (alternatives D and D1) are not truly

alternatives because they do not provide "for open space, environmental protection, or recreation as the site's main, let alone exclusive, use." We disagree.

Alternative D was developed by PMA and presented to the public in 2018. The proposal includes rehabilitation and adaptive use of the Historic District, increased open space, but no housing. The SEIR concludes that although the environmental impacts would be less under this alternative, it did not meet the objective of providing housing. Alternative D1, discussed and rejected in the response to comments, proposes to reduce further development in the Historic District and increase open space and recreation areas by including playing fields, watercraft recreation, cycling opportunities, picnic areas, camping locations, and hiking trails. The SEIR reaches the same conclusion that the environmental impacts would be less than with the Project but that it did not meet the objective of providing new housing.

As discussed above, the project objectives were properly drawn from the Reuse Plan and properly focused the consideration of alternatives in the SEIR. The SEIR was not required to consider a regional park alternative because it did not meet the project objectives. Nor was it required to accept alternatives that did not meet the minimum housing objectives.

## 2. Planning & Zoning Laws

Under Government Code section 65300, "[a] city must adopt a 'comprehensive, long-term general plan' for its physical development. [Citation.] The general plan serves as a ' "charter for future development" ' and contains the city's fundamental policy decisions about such development. [Citation.] The policies in a general plan typically reflect a range of competing interests. [Citations.] 'General plans ordinarily do not state specific mandates or prohibitions. Rather, they state "policies," and set forth "goals." ' [Citation.]

Nevertheless, a city's land use decisions must be consistent with the policies expressed in its general plan. [Citations.] ' "[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements." ' [Citation.] [¶] The rule of general plan consistency is that the project must at least be *compatible with* the objectives and policies of the general plan. [Citations.] '[S]tate law does not require precise conformity of a proposed project with the land use designation for a site, or an exact match between the project and the applicable general plan. [Citations.] Instead, a finding of consistency requires only that the proposed project be "*compatible* with the objectives, policies, general land uses, and programs specified in" the applicable plan. [Citation.] The courts have interpreted this provision as requiring that a project be " 'in agreement or harmony with' " the terms of the applicable plan, not in rigid conformity with every detail thereof.' [Citation.] To reiterate, the essential question is 'whether the project is compatible with, and does not frustrate, the general plan's goals and policies.' " (*Naraghi Lakes Neighborhood Preservation Assn. v. City of Modesto* (2016) 1 Cal.App.5th 9, 17–18.)

"Where, as here, a governing body has determined that a particular project is consistent with the relevant general plan, that conclusion carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion. [Citations.] . . . [¶] Moreover, judicial review of consistency findings is highly deferential to the local agency. [Citation.] '[C]ourts accord great deference to a local governmental agency's determination of consistency with its own general plan, recognizing that "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a

47

range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" ' [¶] In our review of the City's consistency findings in this case, our role is the same as that of the trial court; we independently review the City's actions and are not bound by the trial court's conclusions. [Citation.] In applying the substantial evidence standard, we resolve reasonable doubts in favor of the City's finding and decision. [Citation.] The essential inquiry is whether the City's finding of consistency with the General Plan was "reasonable based on the evidence in the record.' [Citation.] '[A]s long as the City reasonably could have made a determination of consistency, the City's decision must be upheld, regardless of whether *we* would have made that determination in the first instance.' [Citation.] Generally speaking, the determination that a project is consistent with a city's general plan will be reversed only if the evidence was such that no reasonable person could have reached the same conclusion." (*Naraghi Lakes Neighborhood Preservation Assn. v. City of Modesto, supra*, 1 Cal.App.5th at pp. 18–19.)

NCRA contends the Project conflicts with nine goals and policies contained in the City's General Plan. Table 1 in Appendix L to the final SEIR summarizes the City's determination regarding the Project's consistency with the City's General Plan. While we consider each provision of the General Plan identified by NCRA below, we ultimately conclude that the Project, which develops surplus land, includes housing at a mix of densities and cost, adds or improves parks and recreational open space, encourages use of public

transit and provides pedestrian friendly access to neighborhood serving retail outlets, is consistent with the various provisions of the General Plan, taking those provisions both individually and as a whole.

First, NCRA suggests the Project conflicts with Land Use Goal LU-1 and Land Use Policy LU 1.1 which encourages "higher-density and infill mixed-use development affordable to all incomes on vacant and underutilized parcels throughout the City." NCRA argues the Project is "inconsistent with this Goal and Policy because it locates development several miles outside the City's existing residential areas and even farther from the City's urban core area and the urban services that currently serve that area." The City found the Project consistent with the above provisions because it is an "infill, mixed-use project" that includes affordable housing as well as neighborhood serving services and amenities within walking distance of the homes. The City's determination that the development of the surplus property at Point Molate was consistent with these provisions is not unreasonable.

Next, NCRA contends the Project is inconsistent with Land Use Goal LU-2 and Land Use Policy LU 2.1 which promotes "mixed-income development and inclusion of affordable housing units in all neighborhoods" and provides that affordable housing units "should be located close to community and retail amenities such as parks, full-service grocery stores, local public transit stops, retail, and public services." NCRA argues that the Project is inconsistent with this goal and policy because it "creates an isolated community, far from any urban center, and interposes physical and economic barriers preventing disadvantaged individuals from accessing resources." The City determined, to the contrary, the Project is consistent with LU2 and LU2.1 insofar as it provides housing of varying densities at a mix of price

49

ranges, supports transit use, and is located near parks, open space and neighborhood-serving retail. The City's determination is not unreasonable.

NCRA contends the Project is inconsistent with Land Use Policy LU 2.4, which promotes equitable distribution and access to community facilities and infrastructure and prioritizes "the development of new, upgraded or revitalized parks; community facilities such as libraries, medical centers and schools; circulation and safety improvements; and infrastructure in neighborhoods that are currently underserved, have a high proportion of low-income households, and are impacted due to high crime and physical blight." NCRA argues that the Project is inconsistent with this policy because it "does not 'make use of' any 'existing public infrastructure' nor does it serve any 'underserved communities.'" The City found the Project consistent because it adds affordable housing, includes upgrades to existing recreational infrastructure and provides additional parks and trails that are accessible to the public. We agree with the City that this policy does not "mandate locating all new development adjacent to existing residential areas."

NCRA contends the Project is inconsistent with Land Use Goal LU 4 which directs the City to "[p]rotect and preserve natural resources to nurture environmental and human health" and Land Use Policy LU 4.2, which encourages the City to "[p]reserve open space areas along the shoreline, creeks, and in the hills to protect natural habitat" and "protect existing open space." They argue that the Project is inconsistent with this goal because it "eliminates habitat" and "replaces terrestrial habitat with residential and commercial development." But, as the City determined, the Project retains 70 percent of the site as open space and enhances and enlarges the shoreline park. The City reasonably concluded that the Project does not conflict with or frustrate these land use provisions of the General Plan.

50

NCRA contends the Project is inconsistent with Land Use Policy LU 5.2, which supports the creation of "a dynamic mixed-use waterfront that includes amenities and attractions for residents and visitors" and "development on the [San Pablo] Peninsula as a regional recreation destination." NCRA argues the Project is inconsistent with this policy because it "sharply curtails" the "unique opportunity to expand regional recreation in the area, . . . by substituting a token Bay Trail extension for the site's designation as a regional park." The policy, however, expressly provides for mixed-use development, including remediation and rehabilitation of the Winehaven complex at Point Molate. Accordingly, the City reasonably concluded that the Project does not conflict with or frustrate this land use policy.

Finally, NCRA contends the Project is inconsistent with Land Use Goal LU 6, which includes provisions supporting "high-quality and sustainable development" including locating "new development near transit and in areas with existing transportation infrastructure" and reducing "the need for residents and employees to travel by automobile to access daily goods by promoting the location of housing, jobs and recreation uses close to transit lines, bicycle routes and pedestrian improvements." They argue the Project is inconsistent with this goal because there is currently no transit service to Point Molate. While there is no existing transit service to Point Molate, the City correctly notes that the Project includes incorporates "design features and mitigation measures aimed at activating public transit (shuttle to BART) and restoring the pier for public waterborne transit." Moreover, to the extent the Project locates housing near community serving retail and recreation it supports sustainable development as required by the land use goal.

51

### 3. California Constitution

Article XI, section 5 of the California Constitution invests charter cities, including the City of Richmond, with broad authority to "make and enforce all ordinances and regulations in respect to municipal affairs" subject to the State's general laws as to matters of statewide concern such as the required elements of a general plan. NCRA contends that the City "violated its duty under Article 11, section 5 of the California Constitution to exercise its independent land use discretion over use of the Project site unfettered by purported land use restrictions imposed by private development agreements with Winehaven and its predecessors and parties aligned with them." Similarly to the argument rejected above, NCRA argues that the City improperly allowed the 2018 settlement and federal judgment to limit its power to regulate land use in its substantive Project approvals. For the reasons stated above, we also reject this claim. The City did not limit its discretion as a result of the settlement agreement and judgment.

### DISPOSITION

The judgment is vacated insofar as it concludes that the analysis of mitigation measures in the SEIR with respect to tribal cultural resources and wildfire evacuation risks is adequate. The judgment is affirmed in all other respects. Upon remittitur issuance, the trial court shall issue a writ of mandate directing the City to set aside the certification of the final SEIR and to otherwise proceed pursuant to the provisions of section 21168.9. (See *LandValue 77, LLC v. Board of Trustees of California State University* (2011) 193 Cal.App.4th 675, 681.) Plaintiffs shall recover their costs on appeal.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.